**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GIVENS *et al.*, | ) | CASE NO:    1:11-cv-666 |
| | ) | |
| Plaintiffs, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | NANCY A. VECCHIARELLI |
| VAN DEVERE, INC., | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | Doc. No. 24 |

This case is before the undersigned United States Magistrate Judge upon referral to conduct a hearing and to prepare a report and recommendation for the disposition of Plaintiffs Larry Givens's ("Givens") and Trina Mitchell's ("Mitchell") (collectively "Plaintiffs") Rule 23 motion for class certification ("Motion") (Doc. No. 24).  Defendant Van Devere, Inc. ("Defendant" or "Van Devere") opposes Plaintiffs' Motion.  (Doc. No. 35.)  For the reasons set forth below, the Magistrate Judge recommends that Plaintiffs' Motion be DENIED.

## I.    BACKGROUND

### A.    Procedural Background

Plaintiffs filed their class-action complaint on April 1, 2011, alleging violations of the

Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"), and the regulations thereunder, 12 C.F.R. § 226.1 *et seq.* ("Regulation Z"); the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* ("ECOA"); the Ohio Consumer Sales Practices Act, Ohio Revised Code § 1345.01 *et seq.* ("OCSPA"); and the Ohio Uniform Commercial Code, Ohio Revised Code § 1309.601 *et seq.* ("U.C.C."). (Doc. No. 1.)  They were required to file a motion for class certification within 90 days thereafter, on or before July 3, 2011.  (Pls.' Mot. to File Out of Time 1-2, Doc. No. 13; *see* L.R. 23.1(c).)  On July 22, 2011, Plaintiffs sought leave to file their motion for class certification out of time.  (Doc. No. 13.)  Defendant, who did not oppose the request, indicated that the parties also agreed to additional time for Defendant to file a response to any motion for class certification.  (Def.'s "Reply" 2, Doc. No. 17.)  The Court denied as moot Plaintiffs' request to file their motion for class certification out of time and reserved ruling on any extensions of time until the case management conference. (Doc. No. 19.)

The Court held a case management conference on September 9, 2011.  (Minutes 09/09/11.)  After the case management conference, the Court granted Plaintiffs until September 20, 2011, to file their motion for class certification, granted Defendant until October 20, 2011, to file a response, and set a hearing and oral argument on the issue of class certification for December 1, 2011.  (Doc. No. 22.)

On September 14, 2011, Plaintiffs filed their Motion.  (Doc. No. 24.)  On September 20, 2011, Plaintiffs filed a motion for leave to file an amended complaint.  (Doc. No. 25.) Defendant did not respond; therefore, on October 11, 2011, the Court granted Plaintiffs leave to file an amended complaint.  (Order 10/11/11.)  On October 13, 2011, Plaintiffs filed their amended complaint.  (Doc. No. 26.)

On October 18, 2011, the parties filed a joint motion for an extension of time to complete their Rule 23 discovery, for Defendant to file a response to Plaintiffs' Motion, and

for Plaintiffs to file a reply.  (Doc. No. 27.)  The Court granted the joint motion in part, granting shorter extensions than those requested to preserve the December 1, 2011, hearing and oral argument.  (Doc. No. 28.)  On November 16, 2011, Defendant timely filed its response in opposition to Plaintiffs' Motion.  (Doc. No. 35.)

On November 23, 2011, Plaintiffs filed an affidavit of an alleged expert, Mr. Edward Ford, Jr., in support of their Motion.  (Doc. No. 37.)  Plaintiffs' reply brief also was due that day.  (Doc. No. 28.)  Plaintiffs filed an unopposed motion for a five-day extension of time to reply.  (Doc. No. 36.)  The Court granted Plaintiffs' motion (Order 11/23/11), and on November 28, 2011, Plaintiffs filed their reply brief (Doc. No. 40).

On December 1, 2011, the Magistrate Judge held a hearing, on the record, and heard oral argument regarding Plaintiffs' Motion.  (*See* Minutes 12/02/11, Doc. No. 41.)  At the hearing, the Magistrate Judge expressed concern that Plaintiffs failed to come forward in the Motion with evidence of the size of any of the purported classes, and that the class definitions in the Motion were different from those presented in the subsequently filed amended complaint.  The Magistrate Judge also expressed concern that Plaintiffs' counsel had difficulty defining the classes for which Plaintiffs sought certification; failed to cite the specific provisions of law that Defendant's conduct allegedly violated; failed to give any meaningful legal context to the appropriateness of class certification; and failed to explain with citation to relevant case law how Defendant's conduct allegedly violated any specific provisions of law.

By the end of the hearing, Plaintiffs' counsel attempted to clarify some of the purported class definitions for which Plaintiffs sought certification; withdrew from Plaintiffs' amended complaint purported subclasses A(2) and A(3); explained, generally, the bases for class certification; and made oral motions to (1) supplement the Motion to clarify certain matters and, in the alternative, (2) withdraw the Motion, and be granted 45 days to engage

3

in further discovery and additional time for briefing.[1]  The parties' positions were heard and submitted for consideration.

On December 7, 2011, Plaintiffs filed, without leave from the Court, supplemental legal authority regarding their OCSPA claim.  (Doc. No. 42.)  On December 23, 2011, Defendant filed a motion to strike Plaintiffs' supplemental legal authority.  (Doc. No. 44.)  Plaintiffs did not respond to Defendant's motion to strike.

On February 29, 2012, Defendant filed a motion to strike the affidavit of Plaintiffs' expert.  (Doc. No. 48.)  On March 14, 2012, Plaintiffs responded in opposition to Defendant's motion to strike their expert's affidavit and moved for leave to file an amended expert affidavit.  (Doc. No. 50.)  On March 30, 2012, Defendant filed a reply brief in support of its motion to strike the affidavit of Plaintiffs' expert and also opposed Plaintiffs' motion for leave to file an amended expert affidavit.  (Doc. No. 53.)

On April 4, 2012, Plaintiffs filed a motion to strike Defendant's reply in support of its motion to strike the affidavit of Plaintiffs' expert.  (Doc. No. 54.)  On April 11, 2012, Defendant filed a response in opposition to Plaintiffs' motion to strike its reply.  (Doc. No. 56.)

On April 26, 2012, the Court ruled on Plaintiffs' counsel's oral motions and other collateral motions in a separate order.  (Doc. No. 61.)

**B.    Allegations**

The following allegations are set forth in the Amended Complaint and/or the

---

[1] Plaintiffs' counsel did not provide any factual bases in support of his motions, and did not explain why he was unable to complete discovery or adequately present Plaintiffs' arguments to the Court.  Defense counsel opposed Plaintiffs' counsel's oral motions.  (Tr. 45:11-47:4.)  The Court expressed concern about supplemental briefing and indicated that it would take Plaintiffs' counsel's motions under consideration.  (Tr. 48:4-14.)  The parties have not been granted leave to submit any additional filings.

4

documents submitted.

**1.     Plaintiff Larry Givens**

Defendant is an automobile dealership.  On April 5, 2010, Givens sought to purchase an automobile from Defendant.  Defendant agreed to sell Givens a used 2004 Cadillac Escalade.  Givens signed numerous documents related to the purchase, including a credit application,[2] trade-in forms,[3] a Retail Installment Sale Contract[4] ("RISC") and a Conditional Delivery Agreement ("CDA").  The amended complaint further alleges that:

> After the April 5th RISC (RISC #1) was signed, Defendant congratulated the Plaintiff and told him that financing was approved and the Escalade was his to enjoy. Defendant never told Plaintiff that it had surreptitiously obtained his signature on a "Conditional Delivery Agreement," never explained its purported significance and never told Plaintiff anything other than financing was approved.

(Amend. Compl. ¶ 18.)  Defendant permitted Givens to take the Escalade home that day.

Givens's RISC provides, in relevant part, the following information.  Defendant's name and address appear in a box in the top, right corner captioned "Creditor-Seller." (Doc. No. 26-1.)  The opening paragraph states:

> You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on

---

[2] No credit applications are attached to the amended complaint or the Motion. During the December 1, 2011, hearing and oral argument, Plaintiffs' counsel suggested that evidence of, or citation to any credit applications signed by Plaintiffs or potential class members was unnecessary because he assumed every customer signed a credit application.  (Tr. 42:23-43:3.)

[3] No trade-in forms are attached to the amended complaint or the Motion, and although the amended complaint alleges Givens signed a trade-in form, the amended complaint does not allege that Givens traded a vehicle to Defendant as part of his purchase.

[4] Although Plaintiffs attached to their amended complaint Givens's RISC and Mitchell's RISC, the RISCs indicate that the agreements they memorialize are governed by the terms on the front and back of the forms and Plaintiffs did not attach the backs of the RISCs.

5

credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor-Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

(Doc. No. 26-1.) The Federal Truth-In-Lending Disclosures provide that the annual percentage rate was 14.00%; the finance charge was $10,778.90; the amount financed was $26,664.10; the total payment was $37,443.00; and the total sale price, including a down payment of $250.00, was $37,693.00. (Doc. No. 26-1.) Sixty payments were due in the amount of $624.05 each. (Doc. No. 26-1.)

Givens's RISC contains a section titled "Limited Right to Cancel," but there is a notation in that section indicating that it is "Not Applicable" ("N/A"), and there are no signatures on the signature blocks at the bottom of the provision. (Doc. No. 26-1.) Givens's RISC also contains a "No Cooling Off Period" provision:

State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees, if this contract is subject to the limited right to cancel described above, or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.

(Doc. No. 26-1.) And Givens's RISC indicates how the contract may be changed:

This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding.

(Doc. No. 26-1.)

Givens's CDA provides, in relevant part, the following information. The automobile purchase agreement with Defendant is contingent upon the customer's ability to obtain third-party financing; the customer is taking possession of the automobile before financing

6

approval only as a convenience; the agreement for the sale of the vehicle is not complete

unless and until financing is approved; and, in the event the customer signed an RISC, the

dealership will assign that contract to a third party to complete the transaction.[5] (Doc. No.

26-4.)  Sub-paragraph one of the CDA is a cancellation provision:

> I understand that if either I or the Dealership is unable to obtain third party financing approval or assignment of the contract/lease, within _5_ days of the above listed date, I and/or the Dealership may cancel the purchase/lease contract and I must immediately return the vehicle to the Dealership.

(Doc. No. 26-4.)  Sub-paragraph two provides that the purchase agreement was

specifically contingent upon the customer's credit worthiness and contains a representation

by the customer that all of the information provided on the credit application is true and

correct.  (Doc. No. 26-4.)  Further, this paragraph contains an acknowledgment that the

"Dealership does not control my credit rating for financing purposes and did not guarantee

a finance rate or APR."  (Doc. No. 26-4.)  Sub-paragraph four provides that, if the

--------

[5] The introductory paragraph to Givens's CDA states:

> I understand that the Dealership has allowed me to take possession of the vehicle as a convenience to me, prior to financing approval, and that the agreement for the sale/lease of the vehicle is not complete until and unless financing has been approved.  I understand and agree that it is the intent of both the dealership and myself that financing will be obtained either directly from a third party financial institution/lessor, or in the event I signed a Retail Installment Sales Contract or Lease with the Dealership, that the Dealership will assign that contract/lease to a third party to complete the transaction. I understand that this Conditional Delivery Agreement reflects my agreement with the Dealership to take possession of the vehicle, subject to the following terms and conditions, until my request for financing has been approved.

(Doc. No. 26-4.)

7

purchase/lease agreement is cancelled, the customer agrees to return the automobile immediately.  (Doc. No. 26-4.)  Sub-paragraph four also provides that the customer consents to Defendant's peaceful repossession of the automobile if the customer fails to return the automobile to Defendant immediately.  (Doc. No. 26-4.)  The acknowledgment above the signatures states:

> I acknowledge that I have read this Conditional Delivery Agreement and understand and agree to be bound by its terms and conditions.  This agreement is part of the Buyers/Lease Order for the vehicle being purchased or leased, is fully incorporated herein by reference, and all of its terms and conditions are in full force and effect.

(Doc. No. 26-4.)  The CDA bears the signatures of both Givens and Defendant's dealer representative.  (*See* Doc. No. 26-4.)

Givens was not approved for financing within five days of signing the RISC and CDA; therefore, pursuant to the CDA, Defendant cancelled Givens's RISC and called Givens to Defendant's automobile dealership to sign a new RISC.  The new RISC provides different financing terms:  the Federal Truth-In-Lending Disclosures provide that the annual percentage rate was 24.75%; the finance charge was $17,651.55; the amount financed was $22,949.25; the total payment was $40,600.80; and the total sale price, including a down payment of $1,100, was $41,700.80.  (Doc. No. 26-2.)  Sixty payments were due in the amount of $676.68 each.  (Doc. No. 26-2.)  Plaintiffs allege that Defendant was required and failed to give Givens proper notice that his credit was being revoked.  Nevertheless, Givens and his wife signed the new RISC, and Givens was permitted to keep the Escalade.

**2.     Plaintiff Trina Mitchell**

8

On October 4, 2010, Mitchell sought to purchase an automobile from Defendant. Defendant agreed to sell Mitchell a used 2008 Chevrolet Cobalt.  Mitchell signed numerous documents related to the purchase, including a credit application, trade-in forms,[6] and an RISC.  The amended complaint does not allege that Mitchell signed a CDA, and no evidence of a CDA signed by Mitchell is attached.  Defendant permitted Mitchell to take the Cobalt home that day.

The general provisions of Mitchell's RISC are identical to Givens's RISC.  (*See* Doc. No. 26-3.)  In addition, the Federal Truth-In-Lending Disclosures provide that the annual percentage rate was 22.00%; the finance charge was $10,730.23; the amount financed was $14,363.63; the total payment was $25,093.86; and the total sale price, including a down payment of $500.00, was $25,593.86.  (Doc. No. 26-3.)  Sixty-six payments were due in the amount of $380.21 each.  (Doc. No. 26-3.)

The amended complaint alleges that Mitchell "signed as directed ('sign here') and Defendant delivered the Cobalt to [Mitchell], telling her that financing was approved." (Amend. Compl. ¶ 20.)  After Mitchell took possession of the Cobalt, Defendant called her by telephone and informed her that there was "something wrong" with her credit and that she either had to obtain a co-signer for her purchase agreement or purchase a different car.  Mitchell refused both options and, "believing she had no other option," returned the Cobalt to Defendant.  (Amend. Compl. ¶ 22).  Plaintiffs allege that Defendant was required and failed to give Mitchell proper notice that her credit was being revoked and that her

---

[6] Although the amended complaint alleges Mitchell signed a trade-in form, the amended complaint does not allege that Mitchell traded a vehicle to Defendant as part of her purchase.

9

automobile was being reclaimed.

### 3.    Plaintiffs' General Allegations and Class Definitions Set Forth in the Amended Complaint

Plaintiffs allege in the amended complaint that the TILA claim has a one year statute of limitation, the ECOA claim has a two year statute of limitation, the OCSPA claim has a four year statute of limitation, and the U.C.C. claim has a four year statute of limitation.[7] (Amend. Compl. ¶ 7.)  Plaintiffs' allegations as to each claim and purported class definition are as follows.[8]

### a.    TILA General Allegations and Proposed Classes

Plaintiffs set forth the following general allegations in their amended complaint:

Defendant as a creditor at all times material refused to comply with TILA by providing Plaintiffs and the putative classes with retail installment sales contracts (RISCs) containing contradictory, irreconcilable, illusory, and meaningless disclosures, obtained their signatures on the RISCs, then *delivered the purchased vehicles to Plaintiffs and the putative class members with no intention to honor any contract term or provision*.  Instead Defendant purports to tell all finance buyers that it is not a creditor and that there is no creditor unless it chooses to sell the RISC to an assignee.  *Defendant surreptitiously obtains the buyers' signatures on a separate waiver form which Defendant euphemistically calls a "Conditional Delivery Agreement" pointing only to the signature lines ("sign here") intentionally not disclosing its purported significance*. The form contains language purporting to relieve Defendant from its legal status of creditor, referring instead to some third party as a creditor, and then only if Defendant chooses to assign its contract.  According to Defendant it is at the time of assignment that contract consummation occurs, if at all, which is a violation of TILA. 15  U.S.C.  §1601(a),  §1602(f),  (g),  §1638(b),  12  C.F.R.

---

[7] In their Motion, contrary to the allegations in the amended complaint, Plaintiffs state that the OCSPA claim has a two-year statute of limitation and do not state the limitation period for their U.C.C. claim.  (Pls.' Mot. 2.)

[8] The purported class definitions are derived from Plaintiffs' amended complaint as modified by counsel during the hearing and oral argument held on December 1, 2011.  (*See* Amend. Compl. ¶ 24; Minutes 12/02/11, Doc. No. 41.)

§226.1(b), §226.2(a)(13), (17), §226.17(b), §226.18. *Bragg v. Bill Heard Chevrolet, Inc. - Plant City*, 374 F.3d 1060 (11th Cir. 2004); *Patton v. Jeff Wyler Eastgate, Inc.*, 608 F.Supp.2d 907 (S.D. Ohio 2007).  (A copy of the Plaintiffs' RISCs that were unilaterally nullified by Defendant are attached as Exhibits A (Givens) and C (Mitchell)).

(Amend. Compl. ¶ 3) (emphasis added).  Elsewhere in the amended complaint, Plaintiffs

allege:

9.    [T]heir RISCs were not completed as to all essential provisions because at the time Plaintiffs and the putative class members signed a RISC, Defendant considered the Truth in Lending terms to be non-final and subject to change at Defendant's whim.  Defendant in practice either unilaterally changes the RISC terms and then obtains the Plaintiffs' and the putative class members' signatures on a second, unbargained-for contract, or unilaterally revokes the RISC and seizes or otherwise reacquires the purchased vehicles from the buyers, often days or weeks after contract signing.  Hence, the credit terms are not completed at the time of consummation, are fictitious and illusory, and are completed, if ever, long after contract signing, depending upon whether Defendant chooses to assign the buyer-signed RISCs to a third party, or chooses to revoke the RISCs and unilaterally change the terms to its advantage.

10.  Over the past several years, Defendant combined a completed (buyer-signed) RISC with a second form that purported to relieve Defendant from its status as creditor and to waive the consumer protections of TILA, the ECOA, and the OCSPA, in this case a so-called "Conditional Delivery Agreement."  Such waiver forms and waiver provisions are illegal as being contrary to the public policy enacted by TILA whose very purpose is to provide a meaningful disclosure of credit terms to consumers, including plaintiffs and the putative class members. 15 U.S.C. §1601(a).  TILA is to be construed liberally in favor of consumers, and to punish even the most technical violations of the Act.  According to Defendant's unilateral revocation language, Defendant disclaims that it is a creditor despite the RISCs which expressly identify and represent the Defendant as the creditor.  According to Defendant, by claiming that it is not a creditor and claiming that it can repossess the sold vehicle if it chooses not to assign the RISC, it is magically discharged from TILA compliance because TILA applies only to creditors.

(Amend. Compl. ¶¶ 9, 10.)  Plaintiffs then allege that the terms of the CDA and RISC

"completely contradict each other and are irreconcilable" because the RISC purports to

extend credit and the CDA simultaneously nullifies the credit.  (Amend. Compl. ¶ 11.)  Most

11

disconcerting is Plaintiffs' misquote of a very critical provision of the CDA upon which

Plaintiffs base their claim that Defendant unilaterally nullifies credit.  Purporting to quote the

CDA, Plaintiffs allege:

> [I]f the Dealership is unable to obtain third party financing approval or assignment of the contract within 5 days, the Dealership may cancel the purchase contract.  [A]ny financing rate discussed can be changed (increased or decreased) unilaterally by the (Dealership).

(Amend. Compl. ¶ 11b.)  To the contrary, the CDA attached to the amended complaint

signed by Givens[9] states:

> I understand that if *either I or the Dealership* is unable to obtain third party financing approval or assignment of the contract/lease, within  5  days of the above listed date, *I and/or the Dealership* may cancel the purchase/lease contract and I must immediately return the vehicle to the Dealership.

(Doc. No. 26-4) (emphasis added).

Plaintiffs make other allegations in the amended complaint that are conclusory,[10]

confusing, and, quite frankly, incomprehensible.  For example, they cite to statutory

provisions and  regulations generally without any apparent nexus between their alleged

facts and the specific requirements of these statutes and regulations, and simply cite to two

---

[9]  The amended complaint does not specifically allege that Mitchell signed a CDA, nor is such a document signed by Mitchell attached to the amended complaint.

[10]  The amended complaint also alleges that "the form contains language purporting to relieve Defendant from its legal status as creditor, referring instead to some third party as a creditor, and then only if Defendant chooses to assign its contract," and "[a]ccording to Defendant it is at the time of assignment that contract consummation occurs, if at all, which is a violation of TILA."  (Amend. Compl. ¶ 3.)  The CDA attached to the amended complaint, however, contains no such language.  The word "creditor" does not even appear in the CDA provided.  The documents speak for themselves; these allegations are merely Plaintiffs' conclusory interpretations.

TILA cases[11] without any context.

Plaintiffs seek actual and statutory damages, costs, and attorney's fees for the alleged TILA violations.  (Amend. Compl. ¶¶ 30, 37.)

Plaintiffs propose two TILA classes—a general class and a sub-class—as follows:[12]

> **TILA General Class**: All persons who have signed a retail installment sale contract with defendant within the class period defined by the applicable statute of limitations whose signatures were also obtained by defendant on a form purporting to give the defendant the right to nullify their contracts,[13] which forms and language also purport to relieve defendant from its status as creditor.

> **TILA Subclass**: All persons who have signed a retail installment sale contract with defendant within the class period defined by the applicable statute of limitations and whose signatures were also obtained by defendant on a form purporting to give the defendant the right to nullify their contracts, received automobiles, and had their automobiles taken back by Defendant.

(*See* Amend. Compl. ¶ 24; Tr. 26:20-27:25, 30:18-21.)

### b.    ECOA General Allegations and Proposed Class

The ECOA provides, in relevant part, that a creditor must notify credit applicants of its action on their credit applications within thirty days after receiving the applications.  15

---

[11] Plaintiffs cite to *Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060 (11th Cir. 2004) and *Patton v. Jeff Wyler Eastgate, Inc.*, 608 F. Supp. 2d 907 (S.D. Ohio 2007).  These cases address many legal issues and apply them to the specific documents before the deciding court.  Citation to  cases in an amended complaint is unusual and inappropriate; nevertheless, unless one reads these cases, Plaintiffs TILA claim is largely unintelligible.

[12] The amended complaint proposes three TILA subclasses.  (*See* Amend. Compl. ¶ 24.)  At the December 1, 2011, hearing and oral argument, Plaintiffs' counsel did not realize he proposed different classes in Plaintiffs' Motion (*see* Tr. 18:2-7) and withdrew the second and third subclasses (Tr. 48:17-24).

[13] Plaintiffs' counsel clarified during the December 1, 2011, hearing and oral argument that the "form purporting to give the defendant the right to nullify" is the CDA, which counsel asserts without any apparent evidentiary support was used identically in all relevant transactions.  (Tr. 16:14-17:25, 19:13-15.)

13

U.S.C. § 1691(d)(1).  Like the TILA claim, the allegations pertaining to the ECOA claim are spread throughout the amended complaint.  Plaintiffs allege that Defendant obtained credit applications from them and others contemporaneously with their signatures on RISCs, rejected and/or revoked the credit applications, refused to honor the credit terms set forth in the RISCs, and failed to give adverse action notices of the rejection or revocation of credit as required by 15 U.S.C. § 1691(d).[14]  (Amend. Compl. ¶ 4.)  Plaintiffs allege that Defendant refuses to honor the credit extended in the RISCs, then "simultaneously and unilaterally revokes it, and . . . reject[s] customer credit applications *ab initio*[; t]hat is, Defendant refuses to honor its extensions of credit thus denying Plaintiffs' and the putative

---

[14] Section 1691 is an anti-discrimination provision that precludes the denial of credit:  (1) based on the applicant's race, color, religion, national origin, sex or marital status, or age; (2) because the applicant's income derives from a public assistance program; or (3) because the applicant exercised his rights under this chapter.  15 U.S.C. § 1691(a).  Section 1691(d) provides that a person who completes an application for credit and has his credit denied or revoked, or has the credit terms changed, is entitled to a statement of reasons either in writing or orally.  *See* 15 U.S.C. § 1691(d).  Section 1691(d)(2) states:

> Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by—
>
> (A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or
>
> (B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

15 U.S.C. § 1691(d)(2).

14

class members' applications for credit." (Amend. Compl. ¶ 4.)  Plaintiffs seek actual damages, "statutory punitive" damages, and declaratory and injunctive relief.  (Amend. Compl. ¶ 38, 51.)  The amended complaint alleges that both Givens and Mitchell signed credit applications with Defendant in connection with their automobile purchases.  (Amend. Compl. ¶¶ 15, 20, 41.)  Plaintiffs define their ECOA class in the amended complaint as follows:

> All consumers who have signed a credit application with defendant within the class period defined by the applicable statute of limitations and signed an installment contract prepared by defendant whose initial installment contract was revoked by defendant *after defendant had obtained their credit report* and who were not provided with an adverse action notice by defendant that their credit was revoked.

(*See* Amend. Compl. ¶ 24) (italics added).  At the hearing, after the Court questioned whether the amended complaint alleged that Defendant obtained credit reports for Givens and Mitchell, Plaintiffs' counsel asked that the language in the amended complaint pertaining to credit reports (as set forth in italics above) be stricken from the class definition (Tr. 49:1-51:12); and further requested that, to the extent there were discrepancies between the class definitions set forth in the Motion and the amended complaint, the definitions in the amended complaint at paragraph 24 prevail.[15]  (Tr. 18:15-

---

[15]  Plaintiffs proposed an entirely different ECOA class definition in their motion for class certification:

> All persons within the applicable class period who have signed a RISC prepared by defendant and whose signatures were also obtained by defendant on a form entitled "Conditional Sales Agreement" or similar provision purporting to give defendant the ability to revoke the RISC under certain circumstances and who were not provided a written adverse action notice by defendant pursuant to 15 U.S.C. §§1691, et seq., and Regulation B.

15

17).  For Plaintiffs and the putative class members, the amended complaint seeks (1) actual damages for their embarrassment, humiliation, mental distress, and inconvenience; (2) statutory damages; (3) declaratory relief; and (4) injunctive relief ordering Defendant to establish procedures to ensure compliance with the ECOA.  (Amend. Compl. ¶¶ 38, 44, 51.)  Notably, the purpose of 15 U.S.C. section 1691 is to eradicate credit discrimination based on race, color, religion, national origin, sex or marital status, receipt of public assistance, or age.  *See* 15 U.S.C. § 1691(a); *Mays v. Buckeye Rural Elec. Co-op, Inc., 277 F.3d 873, 876 (6th Cir. 2002)*.  Plaintiffs have not alleged any discrimination in connection with the denial of credit; nor have they set forth any facts that would put them within any one of the groups protected by the ECOA.

### c.    OCSPA General Allegations and Proposed Class

The OCSPA provides, in relevant part, that a "supplier" shall not commit unfair, deceptive, or unconscionable acts or practices in connection with consumer transactions and contains a list of conduct that may be taken into consideration to determine whether a supplier has acted unfairly, deceptively, or unconscionably.  Ohio Rev. Code §§ 1345.02, 1345.03.  Plaintiffs allege that Defendant's conduct was unfair, deceptive and unconscionable under the OCSPA (Amend. Compl. ¶¶ 5, 58), as Defendant "consistently" engaged in the following conduct:

a.    [O]btaining customer signatures on contracts that are not fully completed at the time the customer signs.

b.    [O]btaining customer signatures on contracts that do not reflect accurately the negotiations and agreement between the customer and Defendant.

_____

(Pls.' Mot. 1.)

16

c.      [F]ailing to deliver to Plaintiffs and to the putative class members a copy of a RISC completed as to all essential provisions at or before consummation.

d.      As part of its business practice in every credit sale since 2007, Defendant has obtained its customers' signatures on waiver forms or waiver provisions which purport to relieve Defendant from its status as creditor, and which purport to waive and to circumvent the requirements of TILA, the ECOA, the U.C.C., and the RISCs themselves. Violations of these consumer statutes are per se violations of the OCSPA.

e.      [K]nowingly causing the Plaintiffs to enter into consumer transactions on terms Defendant knew were substantially one-sided in Defendant's favor[.]

f.      [K]nowingly failing to provide disclosures required under federal law, including invariable credit terms and adverse action notices[.]

g.      [D]elaying the time of consummation from the date buyers sign a RISC to a later date when a third party buys the RISC from Defendant or, if a third party does not accept assignment, Defendant claims that no consummation ever occurs. 12 C.F.R. §226.2(a)(13). In practice, Defendant purports to condition Plaintiffs' and the relevant classes' RISCs on Defendant's desire to sell its contractual interest to a third party.

h.      [R]equiring prospective customers to acquire and to pay for casualty insurance on motor vehicles prior to entering into a binding contract for the purchase of a motor vehicle.

i.      [C]harging buyers "documentary fees" of $250.00, which is a deceptive increase in the price of the vehicle disguised as a fee.

j.      [D]eclaring that Defendant itself is not a creditor extending financing under the RISC and that the creditor is some as-yet unknown third party, and then only if Defendant chooses to assign the RISC to a third party. Until then, according to Defendant, there is no creditor.

k.      [C]ontemporaneously extending credit to customers by way of unambiguous RISC provisions including a merger clause, and revoking that extension of credit by use of one or more waiver forms or provisions.

l.      [F]ailing to timely apply for transfer of title as prescribed by statute in those RISC transactions that were revoked by defendant.

17

m.    [F]ailing to provide adverse action notices to it's [sic] rejected financing customers.

n.    [V]iolating TILA and the ECOA as alleged above.

(Amend. Compl. ¶ 55.)  The amended complaint describes the harm as follows:

56.   The harm that is or may be visited by Defendant upon members of the relevant classes is that which befell the Plaintiffs.  That is, Defendant's scheme is to deliver a new or used car to each buyer the same day the buyer sets foot on its lot in order to take her or him out of the car-buying market, i.e., to prevent them from buying from any competitor. *During the transaction, Defendant's words and actions are designed to convince buyers that they are purchasing and financing a motor vehicle at a specific price*, a specific down payment, and at specific financing terms which, when Defendant obtains the buyers' signatures on a retail installment contract, expressly represents to the buyers that the financial terms are agreed-to, are final, and cannot be changed unilaterally.  But by obtaining buyers' signatures on waiver forms or provisions, *Defendant is surreptitiously, deceptively, or otherwise illegally reserving to itself the unilateral and arbitrary ability to change* the terms of the otherwise completed contract, or to cancel the contract and repossess the sold vehicles.

57.   By reserving *the purported right to unilaterally revoke* consumer RISCs, Defendant can and does insert financing terms in RISCs that are intentionally false just to obtain the buyer's signature and take the buyer out of the market so the buyer will shop no further in the belief that he or she has a completed deal. *Defendant's real intention*, however, is to call the buyer back to the dealership *to change the terms to its advantage on the false representation that "the bank rejected your credit."* Defendant then demands more money down, raises the interest rate, requires a cosigner, or even changes the year, make or model of the purchased vehicle.

(Amend. Compl. ¶¶ 56, 57) (emphasis added).

Plaintiffs allege that they seek actual and statutory damages, costs, attorney's fees, and declaratory and injunctive relief.  (Amend. Compl. ¶¶ 5, 58-59.)  However, during the December 1, 2011, hearing and oral argument, Plaintiffs' counsel indicated that on this claim Plaintiffs would seek only declaratory and injunctive relief[16] to "streamline the case."

---

[16] The amended complaint alleges that the actual damages under this count "include the expenses related to the purchase of insurance for that period of

(Tr. 51:15-52:14.)  Accordingly, Plaintiffs define the OCSPA class as follows:

> All persons who have entered into a consumer transaction with defendant within the class period defined by the applicable statute of limitations who were subjected to deceptive, unconscionable, and unfair sales acts and practices as defined in the Ohio Consumer Sales Practices Act.

(*See* Amend. Compl. ¶ 24; Tr. 51:24-52:14.)

### d.    U.C.C. General Allegations and Proposed Class

Ohio Revised Code section 1309.601 codifies Revised Article 9 of the Uniform Commercial Code, which relates to a secured party's rights and duties after default.  *See* Ohio Rev. Code § 1309.601.  Section 1309.601 specifically regards the rights and obligations of debtors and secured parties.  *See id.*  Plaintiffs generally allege that, "[i]n taking or constructively taking the sold vehicles from each named Plaintiff and the putative class members in light of a consummated credit contract, Defendant was bound by the default provisions of the RISCs yet ignored its contract and statutory obligations," and further violated the U.C.C. as follows:

a.    By failing to provide notice of any alleged default.

b.    By failing to proceed in a commercially reasonable manner in its attempts to collect on account, i.e., failed to communicate in any manner as to any alleged default, collection, and repossession, and failed to account for any surplus or deficiency.

c.    By failing to send an authenticated notification of disposition.

d.    By failing to timely provide notice of disposition.

e.    By failing to account for any surplus.

f.    By failing to explain calculations of surplus or deficiency.

---

time when Defendant considered the purchased vehicles its property and not the Plaintiffs' or the putative class members' property."  (Amend. Compl. ¶ 5.)

(Amend. Compl. ¶ 63.)  Plaintiffs seek actual and statutory damages, and costs—including statutory damages in the amount of $19,681.55 for Givens and in the amount of $11,910.23 for Mitchell.[17]  (Amend. Compl. ¶¶ 60, 64.)  Plaintiffs define their purported U.C.C. class as follows:

> All persons who have signed a retail installment contract with defendant within the class period defined by the applicable statute of limitations, and whose purchased vehicles were repossessed[18] by defendant but who received no notices from defendant pursuant to the Ohio U.C.C.

(Amend. Compl. ¶ 24.)

This claim is quite confusing, as Ohio Revised Code Sections 1309.601 through 1309.628:  (1) address secured transactions; (2) allow a secured creditor to take possession of property if it can do so without a breach of the peace; and (3) set forth notice requirements to debtors in situations where the creditor disposes of the collateral and the disposition affects the balance of the debt or another's interest in the collateral.  *See, e.g.,* Ohio Rev. Code §§ 1309.610, 1309.6111, *and* 1309.616.  The amended complaint does not assert any facts that support a claim alleging that Defendant is a secured creditor or that the notice provisions of the U.C.C. have any applicability to this case.  That is,

---

[17]  Givens did not have his vehicle repossessed.  Instead, he retained his vehicle after he signed a second RISC.  At the hearing, counsel for Plaintiffs at first said that Givens would be a class representative on this claim because Defendant's corporate representative in his deposition said if Givens and his wife had not signed the "second contract," Defendant would have "done the same thing as we did in Mitchell's."  (Tr. 53:11-16.)  In response to the Court's request for clarity, however, Plaintiffs' counsel said that he would "leave it with Mitchell" (Tr. 53:25), which the Court understands to mean that only Mitchell, and not Givens, would be a class representative for this claim.

[18]  Plaintiffs' counsel contended during the hearing that the term "repossessed" is used loosely to mean either  "retaken," or requiring the customer to return the vehicle involuntarily.  (*See* Tr. 56:19-57:6.)

20

Plaintiffs do not allege any specific facts in support of their claim that Defendant sold the vehicles to Plaintiffs; that Defendant had a security interest in the vehicles within the meaning of the U.C.C.; that Defendant was a secured creditor; that Defendant sold the vehicles after repossessing them; or that Plaintiffs owed a deficiency or were due surplus proceeds as a result of the resale.

## II.    STANDARD OF REVIEW

The principle purpose of class action law suits under Rule 23 is to achieve efficiency and economy of litigation. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974).  The party moving for class certification bears the burden of proving that the purported class satisfies the prerequisites of Rule 23.   *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996); *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982).  A class definition must be sufficiently definite, based on objective criteria, so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class.  *See Romberio v. Unumprovident Corp.*, 385 F. App'x 423, 431 (6th Cir. 2009) (citing John v. Nat'l Sec. Fire & Cas. Co., 501 F.3d 443, 445 (5th Cir. 2007), and *Crosby v. Soc. Sec. Admin. of U.S.*, 796 F.2d 576, 580 (1st Cir. 1986)); *Pettrey v. Enter. Title Agency, Inc.*, 241 F.R.D. 268, 277 (N.D. Ohio 2006); *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977) (collecting cases).  The moving party also must meet the four requirements of Rule 23(a) and then show that the purported class falls within at least one of the subcategories of Rule 23(b).  *Am. Med. Sys.*, 75 F.3d at 1079; *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 520 (6th Cir. 1976).  Rule 23 does not set forth a mere pleading standard; a party seeking class certification must affirmatively demonstrate her compliance

21

with the Rule—that is, she must be prepared to prove, in fact, that the requirements of Rule 23 are met.  *Wal-Mart Stores, Inc. v. Dukes,    U.S.    , 131 S. Ct. 2541, 2551 (2011)*.

Courts must conduct a "rigorous analysis" into whether a plaintiff has met the prerequisites of Rule 23.  *Am. Med. Sys.,* 75 F.3d at 1079; *Falcon,* 457 U.S. at 161.  The court should accept as true the plaintiff's allegations in the complaint.  *Shelter Realty Corp. v. Allied Maint. Corp*., 574 F.2d 656, 661 n.15 (2d Cir.1978); *Edwards v. McCormick,* 196 F.R.D. 487, 490 (S.D. Ohio 2000)*.*  However, mere repetition of the language of Rule 23 is not sufficient; there must be an adequate statement of the basic facts to indicate that each requirement of the Rule is fulfilled.  *See Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974).  Maintainability may be determined on the basis of the pleadings alone if sufficient facts are set forth, but ordinarily the determination should be predicated on more information than the pleadings will provide.  *Id.*  A court may have to "probe behind the pleadings before coming to rest on the certification question."  *Falcon,* 457 U.S. at 160.  The court's rigorous analysis might necessarily touch on aspects of the merits of the underlying claims, but the court must not inquire into the merits of the claims beyond the preliminary determination of whether the prerequisites of Rule 23 are met.  *See Dukes,* 131 S. Ct. at 2552 (clarifying *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78 (1974)*,* which the court explained was often misunderstood for the categorical proposition that courts should never consider the merits of claims when determining whether to certify a class).

Courts have broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Rule 23.  *Am. Med. Sys.*, 75 F.3d at

22

1079.

### III.   LAW & ANALYSIS

Plaintiffs argue that their purported classes meet all of the requirements of Rule 23.

Plaintiff's Motion, however, is materially deficient because it is conclusory, unsupported,

and essentially amounts to a recitation of boilerplate of law on Rule 23.  The Motion could

be denied on this basis alone because Plaintiffs have failed to meet their burden of

showing class certification is appropriate.

Further, the determination of a class generally involves considerations that are

enmeshed in the factual and legal issues comprising the plaintiffs' claims, *Dukes*, 131 S.

Ct. at 2551-52, and the Motion provides no explanation of what particular provisions of law

Defendant allegedly violated and how the allegations show Defendant violated those

provisions.[19]  Rule 23 determinations cannot be made in a vacuum.  *Pettrey*, 241 F.R.D. at

273.  Although courts do not determine the merits of claims at the class certification stage,

an explanation of the law and facts is necessary to provide a useful context and framework

within which the Court may determine whether class certification is appropriate.  Such

context and framework are lacking here.  In addition to the reasons set forth below, the

material deficiencies of Plaintiffs' Motion support the conclusion that the Motion should be

denied.

### A.   Ascertainability of Class Members

Before analyzing the requirements of Rule 23(a), a court should first consider

whether a precisely defined class exists and whether the named plaintiffs are members of

---

[19] Indeed, Plaintiffs cite more substantive law related to their claims in their
amended complaint than in their Motion.

the proposed class. *Berger v. Cleveland Clinic Found.*, No. 1:05-cv-1508, 2007 WL 2902907, at *23 (N.D. Ohio Sept. 29, 2007) (Oliver, J.).  For the following reasons, Plaintiffs' classes are not sufficiently definite and based on objective criteria; accordingly, it is not administratively feasible to determine class membership.

Though not an express requirement of Rule 23, "ascertainability goes to whether the class has been defined such as it encompasses an identifiable group." *Stuart v. Cheek & Zeehandelar, LLP*, 252 F.R.D. 387, 391 (S.D. Ohio 2008).  The "touchstone of ascertainability is whether the class is objectively defined, so that it does not implicate the merits of the case or call for individualized assessments to determine class membership." *Id.* (citing *Napier v. Laurel Cnty.*, No. 06-368, 2008 WL 544468, at *6 (E.D. Ky. Feb. 26, 2008), and *Chiang v. Veneman*, 385 F.3d 256, 272 (3d Cir. 2004)).  A class definition may be overbroad if it includes members who have not suffered harm at the hands of the defendant and are not at risk to suffer such harm in the future.  *See McGee v. E. Ohio Gas Co.*, 200 F.R.D. 382, 388 (S.D. Ohio 2001).

Defendant contends that Plaintiffs' TILA class definitions[20] are overbroad and not based on sufficiently objective criteria in part because a vast majority of customers suffered no harm from signing the RISCs and CDAs, as some customers purchased automobiles from Defendant upon signing the documents pursuant to the terms set forth on the initial RISCs.  (Def.'s Response 27, *citing* Michael Van Devere Aff. ¶ 10.)  Defendant also asserts that some customers obtained better deals on their automobile purchases upon

---

[20] The TILA class definitions include all those who signed RISCs and "a form purporting to give the defendant the right to nullify their contracts [the CDA], which forms and language also purport to relieve defendant from its status as creditor."  (*See* Amend. Compl. ¶ 24; Tr. 26:20-27:25, 30:18-21.)

24

signing a second RISC.  (Def.'s Response 13, *citing* Michael Van Devere Aff. ¶¶ 12-13.)

To address the lack of actual damages by some members of the putative class, Plaintiffs' counsel contended at the December 1, 2011, hearing and oral argument that the TILA classes properly include all customers who signed CDAs in conjunction with RISCs because the mere use of those documents constituted a technical violation of TILA in every instance and would result in an award of statutory damages to each class member.  (Tr. 12:16-14:5.)  One must ignore much of the language in the amended complaint concerning the TILA claim to find that it alleges a "technical violation."  In fact, the thrust of the amended complaint seems to be a "bait and switch" claim, filled with allegations of deceptive intent.  Indeed, paragraph 3 of the amended complaint describes the TILA violation as Defendant's delivery of vehicles to Plaintiffs and the putative class members with no intention to honor any contract term or provision in their RISCs.  (Amend. Compl. ¶ 3.)  It further alleges that "Defendant surreptitiously obtains the buyers' signatures" on a CDA "pointing only to the signature lines ('sign here') intentionally not disclosing its purported significance."[21]  (Amend. Compl. ¶ 3.)  The TILA violation described in the

---

[21] Even at oral argument, counsel for Plaintiffs in describing the alleged TILA violation stated:  "Van Devere itself has no intention of honoring those terms and therein lies the violation of the Truth in Lending Act[, a]nd they don't honor those terms . . . .  Van Devere actually is participating in a bait and switch scheme; that is, putting, for example, Ms. Mitchell out and Mr. Givens out on their installment contracts with certain terms with no intention of honoring those terms and with every intention of calling them back and switching them to a higher priced contract."  (Tr. 8:10-25.)  Plaintiffs' counsel cited the affidavit of Plaintiffs' alleged expert, Mr. Edward Ford, Jr., in support of his argument that Defendant engaged in a bait-and-switch scheme.  (Tr. 82:5-17.)  Counsel did not, however, explain how this evidence supports class certification. Indeed, Plaintiffs did not cite the affidavit in their Motion because they filed the affidavit only after Defendant responded to the Motion; and Plaintiffs never cited the affidavit or explained how it supported class certification in their

amended complaint simply does not describe a mere "technical violation."

Absent an adequate basis to support the theory that all customers who signed any RISC and a CDA suffered harm, the TILA classes are overbroad.  See *McGee*, 200 F.R.D. at 388; *cf. Rodriguez v. Berrybrook Farms, Inc.*, 672 F. Supp. 1009, 1012 (W.D. Mich. 1987) (finding that the plaintiffs met the requirement for defining a class because the definition specified "a group of agricultural laborers during a specific time frame and at a specific location *who were harmed in a specific way*" (emphasis added)).

Even if the Court assumes, however, that the classes would include individuals who signed any RISC and a CDA regardless of whether the individuals suffered actual damages, Plaintiffs' TILA class definitions still would be overbroad.  The Court will not engage in the assumption that all customers who signed any RISC and any CDA, regardless of the content of those documents, are ascertainable members of the class. While Plaintiffs' counsel broadly asserts that all RISCs are essentially the same (Tr. 15:20-16:3), a quick review of the RISCs submitted by Defendant with its Response reveals several critical differences in the various RISC forms, notably the presence of arbitration clauses and language identifying financial institutions and not the Defendant as the other party to the RISCs (*see* Doc. Nos. 35-4 *through* 8).  Also, the forms are not completed so the Court is unable to review whether there is a misrepresentation in the completion of those forms as Plaintiffs allege.  Further, although Plaintiffs' counsel asserts that all CDAs were the same, he cites no evidence in support (Tr. 17:7-21); and Plaintiffs attached only

---

Reply Brief.  Defendant's counsel expressed concern over the affidavit, including that it appears conclusory, but reserved further comment for cross-examination of Mr. Ford.  (Tr. 87:14-18.)  The Court has disregarded Mr. Ford's affidavit for the reasons set forth in a separate order.  (Doc No. 61.)

Givens's CDA to the amended complaint without others for comparison.  And at least one element of Plaintiffs' proposed class definition—that the form described as the CDA purports "to relieve the Defendant of its status of creditor"—is not capable of a precise definition; nor is it capable of an objective determination.  That specific language is not contained in the CDA.  Rather, it is an interpretation of the document proposed by Plaintiffs.  It would be necessary for the Court to analyze and construe each set of agreements and their various contract terms and signatories in order to determine whether an individual was a class member.

Equally troubling is the definition of the form described as the CDA purporting to allow Defendant to nullify the contract.  Plaintiffs' Reply states:

> The form of the RISC is irrelevant because the defendant retains the purported "right" to nullify the contract by way of its so-called "Conditional Delivery Agreement," a violation of the very purpose of TILA. *Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060 (11th Cir. 2004).

(Pls.' Reply 3.)  The CDA does not contain language stating that it nullifies the RISC.  Whether the CDA does this is a conclusion and is a matter of interpretation.  The cited case, *Bragg*, teaches that the specific terms of the agreements must be analyzed to determine whether there is a TILA violation.  *See Bragg*, 374 F.3d at 1066-67.  In *Bragg*, the circuit court considered whether Florida contract law would allow the construction of multiple documents together as a single contract. See *id.*  In so doing, it analyzed the contracts, that is, the Purchase Contracts, Bailment Agreements, and RISC, and noted that none of them referred to the others; more significantly, as the RISC said it could not be modified unless the dealer signed any written changes and the dealer did not sign the Purchase Contracts or Bailment Agreements, the court expressed doubt that Florida

27

contract law construing multiple documents as a single contract would apply.[22]  *See Id.*

*Bragg* is readily distinguishable from the instant case.  In the Givens transaction, both

Defendant's dealer representative and Givens signed the CDA; the CDA refers to an RISC;

and both the buyer and the dealership retained a right to cancel the transaction.[23]

The ECOA,[24] U.C.C.,[25] and OCSPA[26] class definitions also are overbroad and not

---

[22] Unlike the proposed class definitions here, the class definitions in the *Bragg* case, which are set forth in the district court's final order approving a settlement agreement, are clear, identifiable and ascertainable.  *See Bragg v. Bill Heard Chevrolet, Inc., 2007 WL 2781105 (M.D. Fla. Aug, 28, 2007).*

[23] The issue in *Bragg* was whether the district court properly dismissed the plaintiff's claim under TILA upon finding that no credit agreement had been consummated and, therefore, no TILA violation had occurred.  *Bragg, 374 F.3d at 1064, 1066.*  Although the court in *Bragg* expressed doubt about whether the multiple documents at issue could be construed together as a single contract under Florida law, it chose not to decide that legal question.  *Id. at 1067.*  Instead, the Eleventh Circuit reversed the district court's dismissal and held that "in a financing agreement containing a condition precedent where the condition of obtaining financing is within the exclusive control of the seller and third-party lender, consummation occurs when the consumer signs the contract."  *Id. at 1067-68.*  Plaintiffs do not explain how *Bragg* is useful for determining whether class certification is appropriate here or how the case supports their motion for class certification.

[24] The ECOA proposed class is:

> All consumers who have signed a credit application with defendant within the class period defined by the applicable statute of limitations and signed an installment contract prepared by defendant whose initial installment contract was revoked by defendant and who were not provided with an adverse action notice by defendant that their credit was revoked.

(*See* Amend. Compl. ¶ 24; Tr. 49:1-51:12.)

[25] The U.C.C. proposed class is:

> All persons who have signed a retail installment contract with defendant within the class period defined by the applicable statute

based on sufficiently objective criteria.  The purported ECOA class is comprised of

members who did not receive "adverse action notices."[27]  The amended complaint seeks,

in part, actual damages and declaratory relief.  However, the proposed class definition

does not suggest that discrimination is a factor relevant to class membership; Plaintiffs

provide no legal or factual context to determine whether any purported class member was

entitled to notice under the Act; and the Court would have to examine each individual

notice and the circumstances surrounding each transaction, as well as the relevant case

law, to determine whether any notices complied with the ECOA.  The proposed class

definition is simply conclusory and lacking in objective criteria.

The proposed class definition under the U.C.C. suffers a similar flaw.  The Court

---

of limitations, and whose purchased vehicles were repossessed by
defendant but who received no notices from defendant pursuant to
the Ohio U.C.C.

(Amend. Compl. ¶ 24.)

[26] The OCSPA proposed class is:

All persons who have entered into a consumer transaction with
defendant within the class period defined by the applicable statute
of limitations who were subjected to deceptive, unconscionable,
and unfair sales acts and practices as defined in the Ohio
Consumer Sales Practices Act.

(*See* Amend. Compl. ¶ 24; Tr. 51:24-52:14.)

[27] The ECOA is an anti-discrimination statute that defines "adverse action" as "a
denial or revocation of credit, a change in the terms of an existing credit
arrangement, or a refusal to grant credit in substantially the amount or
substantially the terms requested."  15 U.S.C. § 1691(d)(6).  The ECOA's
notification provision provides that "[e]ach applicant against whom adverse
action is taken shall be entitled to a statement of reasons for such actions
from the creditor."  15 U.S.C. § 1691(d)(2).

29

would have to determine whether the U.C.C. even applied to each transaction; whether Defendant sold a vehicle to each purported class member; whether Defendant was a secured creditor; whether a notice was required; and, if so, whether each notice complied with the requirements of the U.C.C. Plaintiffs have not produced a bill of sale, title, or other indicia reflecting that a sale occurred. The concept of a vehicle "purchased" by a class member again appears to be something that is not readily ascertainable but must be interpreted from the documents.

And the OCSPA class definition is overbroad and not based on objective criteria because it includes all those whose entered into *any* consumer transaction that violated the OCSPA without defining the nature and circumstances of such transactions. Indeed, the OCSPA class definition, like the other proposed definitions, is inadequate because it is conclusory and would require the Court to make a determination of the merits of each purported member's claim under the OCSPA and whether the facts underlying the transactions constitute deceptive, unconscionable, or unfair conduct under the Act. *See Hagen v. Winnemucca*, 108 F.R.D. 61, 63-64 (D. Nev. 1985) (finding a proposed a class that included "[a]ll persons whose Constitutional rights have been, during the four years immediately preceding the commencement of this action, are or may be violated," insufficient because it required the court to determine whether a person's constitutional rights had actually been violated in order to determine whether that person was a class member).

Courts have discretion to modify proposed class definitions to make it administratively feasible to determine class membership. *Powers v. Hamilton Cnty. Pub.*

*Defender Comm'n*, 501 F.3d 592, 618 (6th Cir. 2007).  But courts do not have discretion to modify a plaintiff's allegations.  The Court is unable to modify the class definitions here because the allegations in the amended complaint largely are not conducive to sufficiently precise class definition, as they set forth conduct and circumstances inherently unique to each class member and would require the Court to make individualized assessments to determine class membership.  *See Romberio*, 385 F. App'x at 431 ("[T]he only way to distinguish between the two sets of individuals is to engage in individualized fact-finding, and the need for such individualized fact-finding makes the district court's class definition unsatisfactory."); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 398 (6th Cir. 1998) ("Because each plaintiff's claim depended upon facts and circumstances peculiar to that plaintiff, class-wide relief was not appropriate.").

In short, Plaintiffs have failed to set forth adequate class definitions.  When plaintiffs have failed to meet the implied requirement of ascertainability, some courts have found it unnecessary to continue with a full analysis of all of Rule 23's prerequisites.  *See, e.g.*, *Owner-Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc.*, No. 2:97-cv-750, 2001 WL 3436624, at *5 (S.D. Ohio Sept. 4, 2001) ("Where named plaintiffs fail to define the class adequately, the court not need proceed to a full analysis under Rule 23."); *Metcalf v. Edelman*, 64 F.R.D. 407, 409 (N.D. Ill. 1974) ("The inability to define concisely a proper class to bring this action precludes plaintiffs from fulfilling all the requirements of Rule 23.").  Nevertheless, the Court will continue its analysis and conduct a rigorous review.  For the reasons set forth below, Plaintiffs also have failed to show that their purported classes meet the explicit requirements of Rule 23(a) and (b).

31

**B.      Requirements of Rule 23(a)**

A class action cannot be certified unless the numerosity, commonality, typicality, and adequacy requirements of Rule 23 are met.  In other words, the plaintiff must show that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representative are typical of the claims or defenses of the class; and (4) the representative party will fairly and adequately protect the interests of the class.[28]  Fed R. Civ. P. 23(a). Plaintiffs have failed to show that they meet all four requirements of Rule 23(a) for each of their purported classes.

**1.      Numerosity**

The numerosity requirement has no strict numerical test but instead requires examination of the specific facts of each case and imposes no absolute limitations.  Am. Med. Sys., 75 F.3d at 1079.  When the class size reaches substantial proportions, the impracticality requirement is usually satisfied by numbers alone.  *Id.*

Defendant contends that a determination of numerosity requires that purported class members be identified, and purported class members cannot be identified absent adequate class definitions.  The Court agrees.  Although plaintiffs need not show the precise number of people that can be expected to be members of a class, *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 672 (N.D. Ohio 1995), and courts may make reasonable inferences

---

[28] Although courts historically have considered adequacy of counsel under Rule 23(a)(4), Rule 23 was amended in 2003 to add subdivision (g) to address the appointment of class counsel.  Fed. R. Civ. P. 23, Advisory Committee Notes, 2003 Amendments, Subdivision (g).  The 2003 addition of subdivision (g), however, was not intended to introduce a new element into the class certification process.  *Id.*

to determine whether numerosity is met, *Senter*, 532 F.2d at 523, numerosity may not be based on mere speculation, *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267-68 (11th Cir. 2009). Plaintiffs' inadequate class definitions would require the Court to speculate as to the number of members in each class.

Defendant also contends that Plaintiffs simply have failed to argue numerosity adequately. The Court agrees. In addressing the issue of numerosity in their Motion, Plaintiffs cited and relied entirely upon a deposition and the factual findings of a Magistrate Judge in another, unrelated case. Upon questioning by the Court during oral argument, Plaintiffs' counsel stated that the Court could ignore the argument for numerosity set forth in the Motion because that argument and accompanying citation to evidence (1) was cut from a document for a different case and pasted into the Motion and (2) had no applicability to the instant case. (Tr. 34:22-35:18.) Although Plaintiffs allege in the amended complaint that membership in each class is expected to exceed 1,000 people (Amend. Compl. ¶ 7), Plaintiffs did not present an argument for numerosity related to this case in any briefs. Nor did they present any evidence on the issue. Finally, Plaintiffs' counsel attempted to salvage this argument during oral argument by citing to a submission accompanying Defendant's brief ("the submission") showing that 327 people signed CDAs contemporaneously with their RISCs in October 2010. (Tr. 35:20-36:19.) This evidence is not enough to establish numerosity for the purported TILA classes because: (1) as already discussed, the "technical violation" theory of TILA liability is not sustainable for a variety of reasons; and (2) the submission does not establish the number of customers who would meet Plaintiffs' class definitions.

The submission also is insufficient to show numerosity for the purported ECOA,

33

OCSPA, and U.C.C. classes, as counsel did not explain the relevance of the submission to those classes, and the mere fact that 327 people signed RISCs and CDAs in October 2010 does not establish the number of persons who may have suffered violations under those Acts.[29]

Because Plaintiffs have failed to set forth adequate class definitions that permit the Court to ascertain class members, have failed to present evidence, and have failed to present a cogent argument for numerosity for each purported class, Plaintiffs have failed to establish numerosity.

### 2.    Commonality

Commonality requires plaintiffs to demonstrate that the class members have suffered the same injury.  *Dukes*, 131 S. Ct. at 2551.  This does not mean merely that class members must have suffered a violation of the same provision of law.  *Id.*  The claims must depend upon a common contention that is of such a nature that it is capable of class wide resolution.  *Id.*  To satisfy the commonality requirement, there need be only a single issue common to all members of the class.  *Am. Med. Sys.,* 75 F.3d at 1080.  However, because almost any set of claims can display commonality at a sufficiently abstract level of generalization, an issue may be deemed common when its resolution will advance the litigation.  *Sprague*, 133 F.3d at 397.

Plaintiffs contend that there are several common questions of law:

a.    Whether Defendant's conduct alleged in [the] complaint is unlawful;

---

[29]  The OCSPA claim in the amended complaint, for example, alleges fourteen separate violations, and the submission does not suggest who suffered any or all of the alleged violations.

     b.      Whether Defendant's conduct alleged in Count I constitutes violations of TILA[;]

     c.      Whether Defendant's conduct alleged in Count II constitutes violation[s] of the ECOA[;]

     d.      Whether Defendant's conduct alleged in Count III constitutes deceptive, unfair or unconscionable acts and practices in violation of the OCSPA[;]

     e.      Whether Defendant's conduct alleged in Count IV violates Ohio Revised Code §§ 1309.601 *et seq.*[.; and]

. . . . .

     g.      Whether Defendant's alleged acts and practices should be declared as violations of TILA, the ECOA, and the OCSPA and be permanently enjoined.

(Amend. Compl. ¶ 28; *see also* Pls.' Mot. 3, 9.)  Plaintiffs also contend there are several common questions of fact, including the following:

     1.      Whether in the course of financing vehicles it sold to its customers, it was the Defendant's practice to reject its status of creditor yet prepares [sic] a retail installment contract and obtains [sic] the buyers' signature on it and on a waiver/revocation form of its creation which purports to relieve the Defendant from its obligations under TILA and the RISC itself;

     2.      Whether in the course of financing vehicles sold to its customers . . . it was the Defendant's practice to reject any status of creditor, deny or reject its customers' credit applications, reject credit after issuing the RISC, then fail to issue adverse action notices under the ECOA; [and]

     3.      The measure of damages available to members of each Class for the Defendant's wrongful conduct.

(Pls.' Mot. 10.)

Defendant responds that Plaintiffs' proposed common questions of law are too general.  The Court agrees, as Plaintiffs' questions of law merely restate Plaintiffs' causes of action.  *See Kelley v. Galveston Autoplex*, 196 F.R.D. 471, 475 (S.D. Tex. 2000) ("If Courts were to address the commonality issue at this level of generality, the requirement

35

would be met every time.  Instead, a Court must look at more particular factual and legal issues.")

Defendant also responds that there are a myriad of facts and circumstances unique to each transaction and, therefore, resolving any one question would not advance this litigation as a class action.  For example:  (a) different contracts were used among different customers; (b) only some people were required to sign a second RISC, and those who did were required to do so for a variety of individual reasons such as their credit ratings or the veracity of the information they provided to Defendant; and (c) some customers who signed second RISCs obtained better terms than those set forth on their first RISCs. (Def.'s Response 12-13, *citing* Michael Van Devere Aff. ¶¶ 5-14.)  The Court agrees that Plaintiffs have failed to demonstrate commonality among the members of their purported classes.

Whether the various contracts violated TILA is a mixed question of law and fact that requires the Court to analyze each contract and the circumstances surrounding the execution of those documents.  Contrary to Plaintiffs' assertion, the measure of damages among the purported TILA class members is not common, as Plaintiffs seek substantial actual damages for themselves but argue that others are entitled to only statutory damages.

Under the ECOA, factual circumstances would vary regarding whether Defendant was a creditor, and such a determination would involve analyzing the content of each contract.  Further, the ECOA prohibits the denial of credit under three circumstances—on the basis of race, color, religion, national origin, sex or marital status, or age; because all or part of the applicant's income derives from any public assistance program; or because the

36

applicant has in good faith exercised any right under the chapter.  15 U.S.C. § 1691(a).

Plaintiffs have not attempted to distinguish membership in the purported ECOA class

based on the various categories of prohibited discrimination.  In other words, Plaintiffs have

not shown that the purported ECOA class members share a common question of fact

regarding the circumstances under which their credit was allegedly denied under the Act.

As to the OCSPA, the amended complaint alleges fourteen different violations of the

Act and it is not clear whether the purported class members suffered the same or all of the

alleged violations; that is, Plaintiffs have not provided an adequate basis to conclude that

answers to questions about any of these factual circumstances would advance litigation on

the OCSPA claim on a class-wide basis.

Likewise, answers to relevant factual questions about the purported U.C.C.

class—such as whether customers were in default, whether their vehicles were

repossessed, whether there was a disposition of their vehicles, whether the disposition was

conducted in a commercially reasonable manner, and whether proper notification of the

disposition was provided—would vary.

Because Plaintiffs have alleged violations under each claim that took many different

forms, and Plaintiffs have not presented any questions that feasibly could be common,

Plaintiffs have failed to demonstrate that there are common issues of law or fact that would

advance this litigation as a class action.  *Cf. Kelley*, 196 F.R.D. at 475 ("The contracts that

Sand Dollar used varied among the customers.  Some allegedly contained no disclosure

language, while others, including that of the named Plaintiff, contained the disclosure

language but omitted asterisks.  Answering the question regarding disclosure as to one

Plaintiff would not answer the question as to all or even close to all the class members.

37

The factual and legal issues involved vary from claim to claim . . . .  Thus, the commonality requirement is not met."); *Chandler v. Sw. Jeep-Eagle, Inc.*, 162 F.R.D. 302, 308 (N.D. Ill. 1995) (finding that the plaintiffs' claims involved the common question of whether the disclosure provisions on retail installment contracts violated TILA and/or the Consumer Fraud Act when all proposed class members purchased a *standard* service contract).

### 3.    Typicality

A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if the claims are based on the same legal theory.  *Am. Med. Sys.*, 75 F.3d at 1082.  In other words, a representative plaintiff's claim is typical if the representative plaintiff would be able to prove other class members' claims by proving his own claim.  *See Sprague*, 133 F.3d at 399.  Typicality is lacking when a class definition encompasses many individuals who have no claim at all to the relief requested, or when there are defenses unique to the individual claims of the class members.  *Romberio*, 385 F. App'x at 431.  Typicality also is lacking when the court must make individualized assessments of the purported class members to determine whether they are entitled to relief under the same legal theory.  *Id.* at 432.

Plaintiffs merely assert that they meet the typicality requirement for each of their purported classes because "the named Plaintiffs' claims and those of each member of the class are virtually identical for all purposes," and "the claims arise out of the same legal theory."  (Pls.' Mot. 12.)  The assertion that all the claims are virtually identical among the purported class members is conclusory, overbroad, and belied by the amended complaint.

Under the TILA claim, the amended complaint alleges conduct by Defendant that is

38

inherently unique to each purported class member, including, among other things, Defendant's intent in entering each transaction, each plaintiff's unknowing or uninformed decision to sign the CDA, and Defendant's alleged representation that financing had been approved.  Although Plaintiffs allege that customers were deceived into signing RISCs and CDAs and instructed to sign the documents without reading them, both Givens and Mitchell testified in their depositions that they chose to sign documents without reading them because they assumed it was not necessary.  (Larry Givens Dep. 29:4-8, Sept. 20, 2011, Doc. No. 35-9; Trina Mitchell Dep. 36:14-37:18, Sept. 20, 2011, Doc. No. 35-10.).  Further, Plaintiffs seek actual damages, which requires proof of detrimental reliance, *see United States v. Petroff-Kline*, 557 F.3d 285, 297 (6th Cir. 2009), and the issue of detrimental reliance requires examination of individual circumstances.  In sum, the record and evidence do not support the conclusion that Givens's and Mitchell's claims are typical of the claims of the purported TILA class members.

Neither Givens nor Mitchell can establish that their claims are typical of the purported ECOA class because, among other reasons, they have not alleged that they were members of a protected class or that they suffered any discrimination.

Givens and Mitchell also cannot establish that their claims are typical of the purported OCSPA class.  The amended complaint alleges that the harm under the OCSPA includes Defendant surreptitiously reserving the unilateral right to revoke the RISCs by obtaining customer signatures on separate waiver forms, but Givens's CDA provides that he had a right to revoke the RISC as well, and there are no specific allegations that Mitchell signed a CDA.  Further, although the amended complaint alleges fourteen separate violations of the OCSPA, the amended complaint does not specifically allege that Givens

39

or Mitchell suffered many of those violations—such as being required to pay a documentary fee of $250.00, or suffering Defendant's alleged failure to apply for the transfer of title in their transactions in a timely.

Finally, with regard to the U.C.C. claim, Mitchell has failed to show that her claim involving the "purchase," "repossession," "resale," and balance deficiency or surplus is typical of any other members of the purported class.

In short, Plaintiffs have failed to provide an adequate basis upon which this Court could conclude that Givens's and Mitchell's claims are typical of the purported class members' claims, or that favorable determinations on their claims would necessarily result in favorable determinations on the purported classes' claims. *Cf. Stout*, 133 F.3d at 399 ("In pursuing their own claims, the named plaintiffs could not advance the interests of the entire early retiree class. Each claim, after all, depended on each individual's particular interactions with GM—and these, as we have said, varied from person to person. A named plaintiff who proved his own claim would not necessarily have proved anybody else's claim.") Indeed, because the Court would be required to engage in individualized assessments of purported class members, typicality is lacking. *See Romberio*, 385 F. App'x at 431.

### 4. Adequacy of Representation

A plaintiff seeking to represent a class must demonstrate that he or she will fairly and adequately represent and protect the interests of the class. *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000). A court's review of adequacy of representation includes an inquiry into whether the class representative will vigorously litigate the case and whether

40

there are any conflicts of interest between the class representative and the purported class members.  *See UAW v. GMC*, 497 F.3d 615, 626 (6th Cir. 2007); *Stout*, 228 F.3d at 717.  Such review also includes determining whether class counsel are qualified, experienced, and generally able to conduct the litigation.  *See UAW*, 497 F.3d at 626; *Stout*, 228 F.3d at 717.

As an initial matter, the class definitions are so broad that the Court is unable to identify the membership in each purported class and, therefore, cannot determine whether Plaintiffs share interests with any purported class members and would adequately represent them.  Nevertheless, Plaintiffs baldly assert in their Motion, without any legal argument or explanation, that they will adequately represent their purported classes.  (Pls.' Mot. 12,15.)  For the following reasons, Plaintiffs have failed to persuade the Court that this is so.

As to the purported TILA classes, Givens and Mitchell do not appear to be adequate class representatives because their deposition testimony contradicts the conclusion that they were deceived by Defendant into signing RISCs and CDAs and instructed to sign the documents without reading them.  (Larry Givens Dep. 29:4-8, Sept. 20, 2011, Doc. No. 35-9; Trina Mitchell Dep. 36:14-37:18, Sept. 20, 2011, Doc. No. 35-10.)  Additionally, Plaintiffs' claims under TILA rest on the allegation that the CDAs gave Defendant the unilateral right to revoke the underlying transactions.  Givens's CDA, however, provides that both Givens and Defendant had the right to revoke their transaction; and there is no allegation or evidence that Mitchell signed a CDA.  In addition, to the extent the TILA class is seeking only statutory damages for a "technical violation" of that Act, Plaintiffs' individual claims seek substantial actual damages, and they have not demonstrated that they will adequately

41

represent individuals pursuing only statutory damages.

As to the purported ECOA class, it does not appear that Givens and Mitchell are adequate class representatives because the ECOA is an anti-discrimination statute and there are no allegations that Plaintiffs were members of a protected class and suffered discrimination because of their membership in that protected class.  Thus, Plaintiffs have failed to show that they would vindicate any discriminatory practices by Defendant.

As to the purported OCSPA class, it appears that Givens and Mitchell are not adequate class representatives because the amended complaint does not contain specific allegations that they suffered many of the alleged violations of the OCSPA.  And as to the purported U.C.C. class, it appears that Mitchell is not a proper class representative because Plaintiffs did not allege that Mitchell signed a CDA, which is the alleged basis for Defendant reclaiming vehicles.  Moreover, Givens retained his vehicle after obtaining new financing.

Plaintiffs further ask the Court to take judicial notice that their counsel is qualified, experienced, and able to conduct this litigation.  (Pls.' Mot. 12, 15.)  Plaintiffs do not, however, cite any legal authority in support of their request for the Court to take judicial notice; do not attach any evidence of counsel's qualifications and experience of which the Court might take notice; and do not otherwise explain how counsel is experienced and qualified.

In short, Plaintiffs have utterly failed to demonstrate that they will adequately represent any certified class in this case.[30]  *See McPherson v. Kelsey*, 125 F.3d 989,

---

[30]  The quality of Plaintiffs' briefing, as well as counsel's apparent lack of
preparation and ability to articulate Plaintiffs' position clearly and adequately at

995-96 (6th Cir.1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006) (citing *McPherson* to reject an inadequately developed argument).

## C.     The Requirements of Rule 23(b)

In order to fit any of the subcategories of Rule 23(b), Plaintiffs first must show that their purported classes meet the requirements of Rule 23(a).  As Plaintiffs have failed to make such a showing, they fail to meet the requirements of Rule 23(b).  Additionally, for the reasons set forth below, Plaintiffs fail to show that their purported classes fit any of the other requirements of Rule 23(b).

### 1.     Rule 23(b)(1)

A class action may be maintained if Rule 23(a) is satisfied and if prosecuting separate actions by or against individual class members would create a risk of (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications

---

oral argument, also contradict Plaintiffs' assertions that they are adequate class representatives.  *Cf. Thonen v. McNeil-Akron, Inc.*, 661 F. Supp. 1271, 1274 (N.D. Ohio 1986) (finding class counsel adequate when counsel proffered an affidavit attesting to his qualifications, and when it was "clear from the high quality of the work already done by plaintiffs' attorneys . . . and by their success on the issue of liability that class members will not find their legal representation lacking").

43

or would substantially impair or impede their ability to protect their interests.  Fed. R. Civ.
P. 23(b)(1).  A principal reason for certifying a class under Rule 23(b)(1) is that individual
adjudications would be impossible or unworkable.  Dukes, 131 S. Ct. at 2558.  Rule
23(b)(1)(A) "takes in cases where the party is obliged by law to treat the members of the
class alike (a utility acting toward customers; a government imposing a tax), or where the
party must treat all alike as a matter of practical necessity (a riparian owner using water as
against downriver owners)."  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997)
(quotes and citation omitted).  Rule 23(b)(1)(B) "includes, for example, 'limited fund' cases,
instances in which numerous persons make claims against a fund insufficient to satisfy all
claims."  Id.

Plaintiffs explain in their Motion that litigating this case as an individual action rather
than as a class action would create the risk of inconsistent or varying adjudications that are
prejudicial to the purported class members because "Judges are individuals who may have
different views regarding identical facts."  (Pls.' Mot. 16.)  Plaintiffs also state that "the
adjudication of the claims of one class member would in practice be dispositive of the
interests of other members of the class who are not parties to that particular adjudication,"
and "the other members of the class who are not parties to the adjudication might find that
the protection of their interests was substantially impaired by not participating in the
adjudication."  (Pls.' Mot. 16.)  Plaintiffs do not, however, cite any legal authority in support
of their assertions or present further arguments on the issue in their Reply Brief or at oral
argument.  Plaintiffs' arguments are unavailing because they are conclusory and merely
restate the requirements of Rule 23(b)(1).

Additionally, Defendant contends that Rule 23(b)(1) is inapplicable in this case

44

because the nature of Plaintiffs' claims are such that there is no threat of creating incompatible standards of conduct for Defendant or impairing others' interests by filing separate claims.  Plaintiffs have not replied to this argument.

Because Plaintiffs have not adequately set forth any analysis or argument showing how their purported classes fit into Rule 23(b)(1), and have not refuted Defendant's contention that Rule 23(b)(1) is inapplicable, Plaintiffs have failed to meet their burden of showing that the purported classes fit either category of Rule 23(b)(1).

### 2.    Rule 23(b)(2)

A class action may be maintained if Rule 23(a) is satisfied and, in addition, the party opposing the class has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.  Fed. R. Civ. P. 23(b)(2).  In other words, Rule 23(b)(2) "requires that the plaintiff seek primarily injunctive or declaratory relief." *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003).  The subdivision "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages."  Fed. R. Civ. P. 23, Advisory Committee Notes, 1966 Amendment, Subdivision (b)(2).

Plaintiffs simply contend in their Motion, without further explanation or citation to relevant supporting legal authority, that they meet Rule 23(b)(2) because "[e]very class member is situated the same:  [t]he defendant's illegal financing procedure was applied to them in an identical manner, including defendant's uniform disregard of TILA."  (Pls.' Mot. 17.)  Plaintiffs' argument is conclusory and belied by their amended complaint, which alleges circumstances and conduct inherently unique to each purported class member.

45

Defendant argues that Rule 23(b)(2) does not apply because Plaintiffs primarily seek money damages and attorney's fees in this case.  Indeed, Plaintiffs do not seek injunctive or declaratory relief on their TILA and U.C.C. claims (although they do seek declaratory and injunctive relief under the ECOA and OCSPA).  Plaintiffs have not disputed this argument and, in fact, allege that the "essence [of] this class action is predicated upon the Truth in Lending Act (TILA)."  (Pls.' Reply 1.)

Because Plaintiffs have not adequately set forth an argument showing how their purported classes fit into Rule 23(b)(2), and have not refuted Defendant's contention that Rule 23(b)(2) is inapplicable, Plaintiffs have not met their burden of showing that the purported classes fit Rule 23(b)(2).  *Cf. Heartland Commc'ns, Inc. v. Sprint Corp.*, 161 F.R.D. 111, 117 (D. Kan. 1995) (finding that the plaintiffs did not meet Rule 23(b)(2) in part because "it [was] clear from the stated causes of action contained in plaintiffs' complaint that the predominant relief requested [was] monetary damages for Sprints' alleged breach of contractual obligations.").  Further, the need for individualized fact finding in the absence of objectively ascertainable class members makes the classes incompatible with Rule 23(b)(2).  *See Romberio*, 385 F. App'x at 432.

### 3.     Rule 23(b)(3)

A class action may be maintained if Rule 23(a) is satisfied and, in addition, if the court finds that the common questions of law or fact predominate over any questions affecting only individual members, and that a class action is superior to other available methods to fairly and efficiently adjudicate the controversy.  Fed. R. Civ. P. 23(b)(3).  One of the primary purposes of a Rule 23(b)(3) class action is to allow groups of people to

46

vindicate their rights when their individual damages are relatively small and it would not be economically practical or possible to pursue such claims separately.  *See Amchem Prods., 521 U.S. at 617*.  Courts should consider a number of factors under Rule 23(b)(3), including (A) class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3); *Amchem Prods., 521 U.S. at 615-16*.

Plaintiffs argue that Rule 23(b)(3) is readily met in consumer rights cases such as this where plaintiffs allege common wrongful business practices; that a class action would be superior to separate actions because it would permit those with limited resources to vindicate their rights; that all the parties involved and the Court would benefit from concentrating this litigation in this forum; and that proceeding in this case as a class action would be manageable.  But Plaintiffs have not pleaded common wrongful business practices in any meaningful way.  Further, Plaintiffs have failed to show that there are any common questions of law or fact.  Accordingly, Plaintiff's have provided no basis to conclude that any questions of law or fact predominate.

Furthermore, the Court is not persuaded that this case would be manageable as a class action.  Manageability "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  *Eisen, 417 U.S. at 164*. This case, as Plaintiffs have presented it, would be unmanageable as a class action because the purported class members are not ascertainable, and the Court would be required to make individualized assessments of an unknown number of purported class

47

members regarding a myriad of facts and circumstances unique to each.  Take, for example, the question of damages.  Where the amount of injury cannot be proven on a class-wide basis, such individualized inquiries could pose a great burden on the court and render the case unmanageable.  *Jackshaw Pontiac, Inc. v. Cleveland Press Pub. Co.*, 102 F.R.D. 183, 195 (N.D. Ohio 1984).  Determining damages for each purported class member here would include answering a plethora of questions such as whether the customer traded an automobile to Defendant as part of his transaction; whether the customer detrimentally relied upon Defendant; whether the customer's first RISC was cancelled; whether the customer signed a second RISC with better or worse terms; whether the customer's automobile was returned upon his refusal to sign a second RISC; and whether the automobile provided to the customer was returned or repossessed by Defendant.  Plaintiffs have not suggested a mechanism by which the Court could make such determinations in an efficient and effective manner.  In short, Plaintiffs have failed to demonstrate that their purported classes meet Rule 23(b)(3).  *Id.* at 196 ("With these problems of [predominance] and manageability in mind, this Court finds that plaintiffs have failed to satisfy the requirements of Rule 23(b)(3).").

### IV.    CONCLUSION

It is Plaintiffs' responsibility to demonstrate that the requirements of Rule 23 are met; and actual, not presumed conformance with Rule 23 is indispensable.  *See Falcon*, 457 U.S. at 160.  Plaintiffs' motion for class certification is materially deficient because it is conclusory, unsupported, and essentially amounts to a boilerplate of law on Rule 23; and Plaintiffs have otherwise failed to show that all of the prerequisites of Rule 23 are met for

48

any of the purported classes.  Accordingly, and for the foregoing reasons, the Magistrate

Judge recommends that Plaintiffs' motion for class certification be DENIED.


                                            s/ Nancy A. Vecchiarelli
                                            U.S. MAGISTRATE JUDGE

Date:  April 27, 2012


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See United States v. Walters, 638 F.2d 947 (6th Cir. 1981); Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**