UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LARRY GIVENS, et al., | CASE NO. 5:11CV666 |
| PLAINTIFFS, | JUDGE SARA LIOI |
| vs. | |
| VAN DEVERE, INC., | **MEMORANDUM OPINION AND ORDER** |
| DEFENDANT. | |

## I. BACKGROUND

### A.     Procedural Background

On April 1, 2011, plaintiffs Larry Givens ("Givens") and Katrina Mitchell[1] ("Mitchell") (collectively, "plaintiffs" or "representative plaintiffs") filed their putative class action lawsuit against defendant Van Devere, Inc. ("Van Devere" or "defendant") alleging violations of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA") and the regulations thereunder, 12 C.F.R. § 226.1, *et seq.* ("Regulation Z"); the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*, ("ECOA"); the Ohio Consumer Sales Protection Act, Ohio Rev. Code § 1345.01, *et seq.* ("OCSPA"); and the Ohio Uniform Commercial Code, Ohio Rev. Code § 1309.601, *et seq.* ("UCC"). (Doc. No. 1.) The complaint was subsequently amended, upon plaintiffs' motion, on October 13, 2011. (Doc. No. 26.)

---

[1] The docket shows Katrina Mitchell as "Trina" Mitchell; however, the complaint itself identifies her as "Katrina." The Court assumes that "Katrina Mitchell" and "Trina Mitchell" are the same person, as no one has argued otherwise.

Prior to the filing of the amended complaint, the Court granted plaintiffs leave to file the motion for class certification (Doc. No. 24)[2] that is now before the Court on a Report and Recommendation ("R&R") of Magistrate Judge Nancy A. Vecchiarelli. (Doc. No. 62.)[3] Plaintiff has raised thirty-two (32) objections to the R&R (Doc. No. 67) and defendant has filed its response to those objections (Doc. No. 72). The matter is ripe for resolution.[4]

**B.   Factual Background**

The legal violations alleged in the complaint arise out of each plaintiff's purchase of a motor vehicle from defendant.

    **1.   The Givens Purchase**

On April 5, 2010, Givens went to Van Devere looking to purchase and finance a used 2004 Cadillac Escalade. (Am. Compl. [Doc. No. 26] ¶ 14) (hereafter "Compl."). Defendant prepared a number of forms for Givens to sign, including a credit application, a purchase contract, title and registration forms, trade-in forms, insurance forms, a conditional delivery agreement ("CDA"), and a retail installment sale contract ("RISC"). (*Id.* ¶ 15.)[5]

The RISC stated that Givens, as the "Buyer," was purchasing the identified vehicle "on credit under the agreements on the front and back of [the RISC]" and that he "agree[d] to pay the Creditor-Seller . . . the Amount Financed and Finance Charge in U.S. funds according to the payment schedule [in the RISC]." The RISC identified "Van Devere, Inc." as

---

[2] Defendant opposed the motion (Doc. No. 35) and plaintiffs filed a reply (Doc. No. 40).

[3] The Court set the motion for a December 1, 2011 hearing and referred it to Magistrate Judge Vecchiarelli to conduct the hearing and issue an R&R. A transcript of the hearing is in the record at Doc. No. 55.

[4] There are also pending cross-motions for summary judgment (Doc. Nos. 58 and 60), as well as a motion to exclude defendant's expert report and opinions (Doc. No. 64). These three motions are also ripe for determination, but are not addressed herein.

[5] A copy of the CDA signed by Givens on April 5, 2010 is attached to the amended complaint as Exhibit D. There is also a copy of the RISC (Ex. B); however, that copy is incomplete. A complete copy is attached to defendant's motion for summary judgment. (Doc. No. 60-4.)

the "Creditor-Seller." (Compl., Ex. A, at 230.) The RISC contained a merger clause providing that it "contains the entire agreement between [Givens and Van Devere] relating to this contract." (*Id*. at 231.) The RISC also included the following "No Cooling Off Period" provision:

> State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees, if this contract is subject to the limited right to cancel described above, or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.

(*Id*.) The "limited right to cancel" referenced in the "no cooling off" provision only applied if a particular box was checked and the buyer initialed the box. This box was neither checked nor initialed on Givens's RISC.[6]

Givens also signed a CDA, which allowed him to taken possession of the vehicle "as a convenience" to him, "prior to financing approval[.]"(Compl., Ex. D, at 235.) The CDA further stated that

---

[6] This inapplicable "limited right to cancel" provision stated:

> __ If checked, a limited right to cancel applies:
> You agree that we have _____ days from the date you sign this contract to assign this contract. If we are unable to assign this contract within this time period, you or we may cancel this contract. This limited right to cancel will end at the earlier of the date we assign the contract or the end of the stated time period. **Please see the back of this contract for important terms of this limited right to cancel.**

(Doc. No. 60-4, bolding in original.) As already noted, this provision on Givens's RISC was not checked and the number of days was indicated as "N/A." On page 4 of the RISC there was a more detailed description of the "limited right to cancel." This description stated, in part:

> a. We agree to deliver the vehicle to you on the date this contract is signed by us and you. You understand that it may take a few days for us to verify your credit and assign this contract. You agree that we have the number of days stated on the front of this contract to assign this contract. If we are unable to assign this contract within this period of time to any one of the financial institutions with whom we regularly do business, you or we may cancel this contract. This limited right to cancel will end at the earlier of the date we assign the contract or the end of the stated time period.
>
> * * *

(*Id*.) The description also stated that, should Van Devere be unable to assign the RISC *and* if it elected to cancel the contract, it would notify the buyer, at which time the buyer would be required to return the vehicle and Van Devere would return any consideration already paid by the buyer.

3

> the agreement for the sale/lease of the vehicle is not complete until and unless financing has been approved. I understand and agree that it is the intent of both the Dealership and myself that financing will be obtained either directly from a third party financial institution/lessor, or in the event I signed a Retail Installment Sales Contract or Lease with the Dealership, that the Dealership will assign that contract/lease to a third party to complete the transaction . . . .

(*Id.*) The CDA reflected Givens's agreement with the defendant "to take possession of the vehicle, subject to the following terms and conditions, until [his] request for financing has been approved:

> 1) I understand that if either I or the Dealership is unable to obtain third party financing approval or assignment of the contract/lease, within 5 days of the above listed date [i.e., 04/05/2010], I and/or the Dealership may cancel the purchase/lease contract and I must immediately return the vehicle to the Dealership.
>
> \* \* \*

(*Id.*)

Givens signed all the documents provided by defendant, but he admits he read none of them. (Givens Dep. [Doc. No. 32] at 270.) Defendant then delivered the vehicle to Givens, retaining, according to the RISC, a security interest in "[t]he vehicle and all parts or goods installed in it." (Doc. No. 60-4 at 890.) Givens claims he was told by defendant's salesperson he would receive a payment book in the mail and, as a result, he "was thinking it was already financed." (Givens Dep. at 270.) He understood, however, that defendant had obtained or would obtain financing from some third party. (*Id.*)

On April 28, 2010, defendant's representative called Givens, informing him that he needed to come to the dealership to provide "proof of more income." (Givens Dep. at 275.) Thereafter, Givens went to the dealership with his wife, who co-signed a new RISC and a new

4

CDA. (Givens Dep. at 276, 277; Compl., Ex. B[7].) Givens admits he did not feel any pressure to sign the new deal, other than his desire to own the vehicle. (Givens Dep. at 277.) Under the new RISC, Givens's monthly payments increased about $50.[8] (*Id*. at 276.) Givens still has the vehicle and continues to make payments on it. (*Id*. at 277.)

## 2. The Mitchell Purchase

On October 4, 2010, Mitchell purchased a 2008 Chevrolet Cobalt from defendant. Like Givens, she signed a number of documents presented to her by defendant, including an RISC and a CDA. (Compl. ¶¶ 19-20 and Ex. C; Doc. No. 60-9[9].) The RISC signed by Mitchell was the same preprinted form signed by Givens; it differed only in the particulars of the deal. Likewise, the CDA was the same preprinted form. Mitchell admits that she did not read the documents, but only looked at the payment amount. (Mitchell Dep. [Doc. No. 33] at 315.) Like Givens, when she left defendant's dealership with her new vehicle, she assumed she had been approved for financing. (*Id*. at 316.) She claims she was never told that financing still had to be arranged and/or that she might have to return the vehicle or sign another contract. (*Id*.)

On October 19, 2010, defendant called Mitchell and told her she would have to come to the dealership to sign some more paperwork because the financing had not gone through due to questions about whether she was full-time employed as she had represented.[10] Mitchell

---

[7] As with the first RISC, this copy of the second RISC is incomplete, showing only one page of the four-page document. A complete copy is attached to defendant's motion for summary judgment. (Doc. No. 60-6.)

[8] The annual percentage rate increased from 14% to 24.7% and the total sale price increased from $37,693.00 to $41,700.80. *Compare* Doc. Nos. 60-4 and 60-6.

[9] There is no copy of Mitchell's CDA attached to the complaint; the copy used by the Court is attached to defendant's motion for summary judgment.

[10] At the time she purchased the vehicle, Mitchell had recently gone from part-time to full-time; she told defendant that and presented pay stubs to show her full-time earnings. (Mitchell Dep. at 317.)

5

initially refused to go back to the dealership and got in touch with an attorney.[11] (Mitchell Dep. at 316, 317.) After speaking with the attorney, she returned the vehicle to defendant sometime in November 2010. (*Id*. at 317.) She then purchased a vehicle from another dealer, obtained financing for that purchase, and is still paying on the vehicle. (*Id*. at 319.)

## II. DISCUSSION

### A. Standard of Review

It is undisputed that the standard of review for the plaintiffs' objections is whether the matter objected to in the R&R is "clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a);[12] *see* Objections (Doc. No. 67) at 1063; Response (Doc. No. 72) at 1164.

### B. The Motion for Class Certification

#### 1. The Proposed Class Definitions

As pointed out in the R&R, plaintiffs' proposed class definitions have been inconsistent. The classes as defined in the motion for class certification are not the same as those defined in the amended complaint, and plaintiffs' counsel further refined the final definitions during the December 1st hearing. After a lengthy procedural discussion, the R&R has settled upon particular class definitions that have not been objected to in any way by the plaintiffs.

---

[11] Apparently, Mitchell later decided to have her husband co-sign new agreements. However, even under those circumstances, her financing was not approved. (Mitchell Dep. at 317-18.)

[12] Ordinarily, nondispositive matters are referred to a magistrate judge for outright disposition, rather than an R&R. Under Rule 72(a), objections to that disposition are then reviewed by the district court under the "clearly erroneous or contrary to law" standard. Dispositive matters can only be referred for an R&R. The district court then reviews de novo, under Rule 72(b)(3), any objections to the R&R. Here, this nondispositive matter was referred for a hearing and an R&R. In this sort of "hybrid" situation, the standard is still the one used for nondispositive matters. *United States v. Quinney*, 238 F. App'x 150, 152 (6th Cir. 2007) ("[w]hen a magistrate judge's finding is challenged in district court, the district court shall apply a 'clearly erroneous or contrary to law' standard of review for 'nondispositive' preliminary matters, while 'dispositive motions' are governed by the de novo standard") (citing 28 U.S.C. § 636(b)(1)(A, B); *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001)).

Therefore, the Court will base its analysis with respect to the appropriateness of class certification upon the following unopposed class definitions[13] derived from the R&R:

> **TILA General Class**: All persons who have signed a retail installment sale contract (RISC) with defendant within the class period defined by the applicable statute of limitations whose signatures were also obtained by defendant on a conditional delivery agreement (CDA), which purports to give the defendant the right to nullify the contract and further purports to relieve defendant from its status as creditor.
>
> **TILA Subclass**: All persons who have signed a retail installment sale contract (RISC) with defendant within the class period defined by the applicable statute of limitations and whose signatures were also obtained by defendant on a conditional delivery agreement (CDA), which purports to give the defendant the right to nullify the contract, received automobiles, and had their automobiles taken back by defendant.
>
> **ECOA Class**: All consumers who have signed a credit application with defendant within the class period defined by the applicable statute of limitations and signed a retail installment sale contract (RISC) prepared by defendant whose initial installment contract was revoked by defendant and who were not provided with an adverse action notice by defendant that their credit was revoked.
>
> **OCSPA Class**: All persons who have entered into a consumer transaction with defendant within the class period defined by the applicable statute of limitations who were subjected to deceptive, unconscionable, and unfair sales acts and practices as defined in the Ohio Consumer Sales Practices Act.
>
> **UCC Class**: All persons who have signed a retail installment sale contract (RISC) with defendant within the class period defined by the applicable statute of limitations, and whose purchased vehicles were retaken by defendant, i.e., involuntarily returned, but who received no notices from defendant pursuant to the Ohio U.C.C.

Plaintiffs have raised thirty-two (32) objections to the R&R, many of which are virtually incomprehensible and/or are more in the nature of arguments on the merits of the claims rather than arguments on the merits of class certification. The Court will not address every one of

---

[13] Because the R&R set forth the class definitions and then modified them slightly by way of footnotes and other comments, the Court has found it necessary to incorporate those footnotes and comments into the final class definitions stated herein. However, the Court believes it has accurately reflected the class definitions and, therefore, can take the position that the definitions are unopposed.

7

the objections individually. Rather, the scope of the 32 objections makes it absolutely evident that plaintiffs are asserting a broad challenge to the recommendation of denial of class certification. Thus, the Court will examine the R&R, as it addresses the motion for class certification, the opposition, and the reply, in combination with support offered by the transcript of the December 1st hearing, to determine whether or not class certification in this case would be appropriate.

### 2. Applicable Law

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure. Rule 23(a) establishes four prerequisites to class certification: the class must be so numerous that "joinder of all members is impracticable;" there must be "questions of law or fact common to the class;" the claims of the representative party must be "typical" of those of the class; and the representative party must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23. "The plaintiffs [have] the burden to prove that the class certification prerequisites [are] met, . . . and the plaintiffs, as class representatives, [are] required to establish that they possess the same interest and suffered the same injury as the class members they seek to represent." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 678 F.3d 409, 416 (6th Cir. 2012) (internal citations omitted).

Some courts have also identified ascertainability of class members as a pre-requisite of Rule 23. *See Romberio v. Unumprovident Corp.*, 385 F. App'x 423, 431 (6th Cir. 2009) (citing *John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) (noting that "[t]he existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23"); *Crosby v. Social Sec. Admin.,* 796 F.2d 576, 580 (1st Cir. 1986) (explaining that a class definition should

be based on objective criteria so that class members may be identified without individualized fact finding); 5 James Wm. Moore et al., Moore's Federal Practice ¶ 23.21[3][c] (3d ed. 2007) (explaining that "[a] class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a particular person is a member of the class")).

Once the prerequisites of Rule 23(a) and ascertainability are met, parties seeking class certification must make the showing required by Fed. R. Civ. P. 23(b). To carry this burden, the moving parties must show that the action is maintainable under Rule 23(b)(1), (2), or (3).

"Class certification is appropriate if the court finds, after conducting a rigorous analysis, that the requirements of Rule 23 have been met. Ordinarily, this means that the class determination should be predicated on evidence the parties present concerning the maintainability of the class action. '[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982), and rigorous analysis may involve some overlap between the proof necessary for class certification and the proof required to establish the merits of the plaintiffs' underlying claims. There is nothing unusual about 'touching aspects of the merits in order to resolve preliminary matters . . . [because doing so is] a familiar feature of litigation.' *[Wal-Mart, Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2552 (2011)]." *In re Whirlpool Corp.*, 678 F.3d at 416-17 (some internal quotation marks and citations omitted). "[A] district court must resolve factual disputes necessary to class certification, but . . . 'the court should not turn the class certification proceedings into a dress

rehearsal for the trial on the merits.'" *Id.* at 417-18 (quoting *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012)).

### 3. Analysis

Plaintiffs' motion actually supplies little or no support for certification of any of the proposed classes. The motion is conclusory, unsupported by evidentiary citations in the record, and is a mere recitation of boilerplate law under Rule 23. Further, the motion offers no explanation as to what provisions of each law were violated by the defendant and how.[14] The Court also notes that neither side applies the Rule 23 requirements on a class-by-class basis. Rather one conglomerate discussion supposedly applies to each of the putative classes. As noted in the R&R, this would be reason enough to deny class certification. Nonetheless, the Court will proceed with an analysis of the necessary requirements for class certification.

### a. Ascertainability

Before analyzing any specific Rule 23 requirements, the Court turns first to the issue of ascertainability, under which it must determine "whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class." *Bentley v. Honeywell Intern., Inc.*, 223 F.R.D. 471 (S.D. Ohio 2004). "[I]mportant elements of defining a class include: (1) specifying a particular group that was harmed during a particular time frame, in a particular location, in a particular way; and (2) facilitating a court's ability to ascertain its membership in some objective manner." *Id.* (citing *Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986) (holding that a class could not be certified because the definition "ma[de] class members impossible to identify prior to individualized fact-finding and litigation" and thereby failed "to

---

[14] As properly noted in the R&R, "[p]laintiffs cite more substantive law related to their claims in their amended complaint than in their Motion." (R&R at 958, n. 19.)

satisfy one of the basic requirements for a class action under Rule 23")). A proposed class may be deemed overbroad if it "would include members who have not suffered harm at the hands of the defendant and are not at risk to suffer such harm." *McGee v. East Ohio Gas Co.*, 200 F.R.D. 382, 388 (S.D. Ohio 2001).

### 1) The Putative TILA Class and Subclass

Defendant argues that the TILA class definitions[15] proposed by plaintiffs are overbroad because they would include persons who could not have suffered harm because of their transactions for the purchase of a vehicle from defendant. Defendant also argues that the proposed classes are not objectively defined and would require individualized assessments to ascertain class membership. In support of this argument, Van Devere submitted an affidavit attesting, by way of example, that in October 2010 (the month that plaintiff Mitchell purchased and then returned her vehicle), Van Devere signed 365 deals with customers, of which only 183 used the same RISC utilized in plaintiffs' transactions. Of the 365 deals, 327 customers signed a CDA. Only 57 of the 365 transactions involved a re-sign and those were for a variety of reasons. Nine (9) of the re-signs resulted in a lower interest rate and lower payments by the customer. Ten (10) of the re-signs resulted in a lower price and lower payment by the customer. Van Devere utilizes a variety of contract forms supplied by different banks and financial institutions. These forms are different from the RISC signed by plaintiffs.

To address the lack of damages by some members of the putative class, at the December 1st hearing plaintiffs' counsel argued that the mere use of any RISC in combination with the CDA constituted a technical violation of TILA and would result in statutory damages to each class member. However, as properly noted in the R&R, the amended complaint simply does

---

[15] This argument also applies to the proposed ECOA class definition.

not allege a mere technical violation of TILA. *See, e.g.,* Am. Compl. ¶ 3 (defendant obtained plaintiffs' signatures on the RISCs "with no intention to honor any contract term or provision" and "surreptitiously obtain[ed] the buyers' signatures on a separate waiver form [i.e., the CDAs] pointing only to the signature lines ('sign here') intentionally not disclosing its purported significance"). The amended complaint alleges intentional violations of TILA and seeks actual plus statutory damages under 15 U.S.C. § 1640(a). (Compl. ¶¶ 30, 36.)

Plaintiffs also do not adequately address Van Devere's assertion that its various customers signed different forms that are not identical to those signed by plaintiffs. At the hearing, plaintiffs' counsel simply asserted, without evidentiary support and in the face of contrary evidentiary support, that all the RISCs are essentially the same. He argued that mere "differences in the formatting of what we all know is a retail installment sale contract is immaterial" and that "the form of the contract is irrelevant" because Van Devere is "using it the same exact way as they used [plaintiffs']." (Tr. at 633-34.) Plaintiffs asserted that none of the other contracts submitted by defendant "substantively are any different at all." (*Id*. at 635.) But that is simply not the case. A comparison of the RISCs signed by plaintiffs to the various other RISCs submitted with Van Devere's affidavit reveals that those other RISCs bear virtually no resemblance to the RISCs signed by plaintiffs. Therefore, the mere fact that some customers signed both an RISC and a CDA does not automatically mean that they are all in the class. Plaintiffs' underlying TILA claim argues that the RISCs they signed were essentially nullified by the CDA. They point to specific provisions in their RISCs and in the CDA as evidence of this

nullification, which they argue violates TILA. Notably, those same specific provisions are not found in the other RISCs submitted by defendant.[16]

The Court concludes, as did the R&R, that the TILA classes, as defined by plaintiffs,[17] are not ascertainable because of the significant differences in the forms signed by the various putative class members. There would need to be a person-by-person analysis to simply determine which of Van Devere's customers fit within the proposed class or subclass; that is, as the classes are currently defined, it is "impossible to identify [class members] prior to individualized fact-finding and litigation[.]" *Bentley*, *supra*.

### 2) The Putative EOCA Class

Count II of the amended complaint seeks actual and punitive damages, as well as declaratory and injunctive relief, for defendant's failure to provide plaintiffs and all putative class members with any written notification of the reasons for defendant's adverse credit action in response to rejected credit applications and/or for defendant's revocation of plaintiffs' RISCs. (Compl. § 38.)

The R&R recommends denial of class certification for the ECOA claim in part because the proposed class definition does not suggest that discrimination is a factor relevant to class membership. (R&R at 964.) Plaintiffs object to this conclusion, asserting that it applies the wrong legal standard since a defendant violates the ECOA by simply failing to give notice of the

---

[16] Arguably, the Court could modify the TILA class and subclass to include language indicating that only persons who signed the very same RISC form and CDA form as the plaintiffs would be included. Courts have discretion to modify proposed class definitions to make it administratively feasible to determine class membership. *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 618 (6th Cir. 2007). However, given the fact that plaintiffs themselves have been unable to nail down who belongs in the class, as evidenced by the varying definitions provided in their amended complaint and motion, the Court is disinclined to do so on their behalf.

[17] Most of the objections made by plaintiffs to the R&R with respect to the TILA classes are really arguments that go to the merits of whether there have been TILA violations committed by Van Devere rather than to the identity of the putative class members. Of course, these arguments should be reserved for the phase of the case when the Court addresses the merits of the TILA claim.

reasons for denial of credit, even if discrimination is not alleged or claimed. According to plaintiffs, the violation is identical in every instance where the initially-given credit reflected by the first RISC was later revoked without notice as to why. (Objections at 1069.)

The R&R further concludes that an ECOA class is also precluded because, for each class member, factual circumstances would vary regarding whether defendant was a creditor within the meaning of the Act, and such a determination would involve analyzing the content of each contract. (R&R at 971.) Plaintiffs oppose this conclusion, arguing that defendant is the creditor in all cases, regardless of the form of the RISC.

The Court will not address the conclusion and objection relating to whether alleging lack of notice is sufficient, even without an allegation of discrimination, to state a cause of action under the ECOA for two reasons: (1) because this argument goes to the merits and is more appropriately addressed at the summary judgment stage; and (2) because the Court agrees with the R&R that an ECOA class is precluded by the need to make individual factual determinations for each putative class member both as to defendant's status as a creditor within the meaning of the Act and as to an individual class member's damages, if any.

Plaintiff proposes a class of persons who signed both an RISC and a CDA and whose initial RISC was revoked without a proper "adverse action" notice. However, defendant argues convincingly that there are many facts and circumstances unique to each transaction such that resolving any one question would not advance the litigation as a class action. In an affidavit filed by defendant to support its opposition to class certification, Michael Van Devere, president and co-owner of Van Devere, Inc., attests that there were different contracts signed by different customers; that defendant utilized financing contracts from many different banks and financing institutions; that reasons varied why certain customers were asked to sign new RISCs (e.g., bad

credit or questionable veracity of information provided on their applications); and, that some customers who re-signed actually got better terms on their new contracts. In the face of defendant's affidavit, plaintiffs' simple assertion that defendant is the creditor for all transactions notwithstanding the form of any particular RISC does not adequately address the issue nor lend any support for their argument that the requirement of ascertainability is met.

### 3) The Putative OCSPA Class

The OCSPA class as proposed by the plaintiffs is clearly overbroad, sweeping within its coverage all those who entered into *any* consumer transaction within the relevant time period covered by the statute of limitations. The allegations of the amended complaint do nothing to narrow the interpretation of the class definition. As noted by the R&R, "they set forth conduct and circumstances inherently unique to each class member and would require the Court to make individualized assessments to determine class membership." (R&R at 966.) Plaintiffs object that "all of Defendant's financing transactions are identical." (Objections at 1070.) However, a cursory review of the amended complaint at ¶ 55 shows the extreme particularity of the inquiry that would be required to determine which of defendant's customers might fit into this class, notwithstanding plaintiffs' objection that each of the transactions are identical with respect to these many details.

### 4) The Putative UCC Class

This class as defined by plaintiffs is also overbroad. In order to determine whether a person fits into the class, the Court would have to first determine whether that person was entitled to the UCC notice that plaintiffs complain was not provided. As with the OCSPA claim, the allegations of the amended complaint at ¶ 63 illustrate just how particular the Court's inquiry would have to be. The mere fact that a person's vehicle was "repossessed," which is permitted by

15

the RISC, is not proof that the UCC was violated. Therefore, every person whose vehicle was "repossessed" would not necessarily be in the class. In addition, the Court notes that plaintiff Givens still has his vehicle and is still paying on his contract. Therefore, even he does not fit into this class.

### b. Rule 23 Requirements

As illustrated by plaintiffs' own inability to nail down clear class definitions over the course of proceedings to date, and as concluded by the R&R, "[i]n short, [p]laintiffs have failed to set forth adequate class definitions[ ]" under the ascertainability inquiry. (R&R at 966.) Under these circumstances, the Court need not continue its "rigorous review" of the Rule 23 requirements and will not do so, other than to point out that the discussion above regarding ascertainability also illustrates the difficulty plaintiffs would have proving any of the four Rule 23 requirements. There is simply too much variety in the consumer transactions. It is, therefore, impossible to determine whether there are enough people similarly situated to the plaintiffs to form a proper class. It likewise is impossible to determine whether plaintiffs' claims (which differ even from each other) would involve common questions of law (much less fact) and would be typical for class purposes. Finally, it is impossible to determine whether these two plaintiffs are proper representatives of any class.

The Court is not determining that these plaintiffs cannot prevail on their claims, as that determination is left for another day. Rather, the Court only determines that plaintiffs have failed to meet their burden of establishing entitlement to class certification using the class definitions they have supplied.

## III. CONCLUSION

For the reasons set forth above, plaintiffs' objections to the R&R recommending denial of plaintiffs' motion for class certification are **OVERRULED**. Accordingly, Doc. No. 24 is **DENIED**.

The Court notes that there are currently pending cross-motions for summary judgment. These will need to be resolved before any further proceedings. However, the parties are, as always, encouraged to engage in settlement discussions, to request the Court's assistance in that regard, if needed, and to promptly inform the Court of any settlement.

**IT IS SO ORDERED**.

Dated: September 17, 2012

                                            **HONORABLE SARA LIOI**
                                            **UNITED STATES DISTRICT JUDGE**